## PEOPLE v LEE

Docket No. 140902. Submitted April 13, 1995, at Grand Rapids. Decided July 21, 1995, at 9:10 A.M. Leave to appeal sought.

Albert Lee, III, was convicted by a jury in the Kent Circuit Court, George V. Boucher, J., of felony murder in connection with the abduction and murder of an eleven-year-old schoolgirl. The Court of Appeals, MᴀᴄKᴇɴᴢɪᴇ, P.J., and C. W. Sɪᴍᴏɴ, J. (Mᴀʜᴇʀ, J., dissenting), in an unpublished opinion per curiam, decided May 9, 1983 (Docket No. 51044), affirmed, holding that the admission of the testimony of hypnotized witnesses was proper and that the admission of similar-acts testimony to show identity was not error. The Supreme Court remanded the case to the Court of Appeals for reconsideration. 422 Mich 928 (1985). The Court of Appeals, MᴀᴄKᴇɴᴢɪᴇ, P.J., and Mᴀʜᴇʀ and Bᴇᴀsʟᴇʏ, JJ., affirmed in an unpublished opinion per curiam, decided November 21, 1985 (Docket No. 85840). The Supreme Court reversed the conviction and remanded the case for a new trial, holding that the testimony of the hypnotized witnesses was inadmissible absent proof by clear and convincing evidence that the testimony was based on facts recalled and related before hypnosis. 434 Mich 59 (1990). The defendant was again convicted by a jury of felony murder and was sentenced by the trial court, Robert A. Benson, J., to life imprisonment without parole. The defendant appealed.

The Court of Appeals *held:*

1. The trial court did not abuse its discretion in admitting into evidence the testimony of various witnesses who had been hypnotized. The testimony of those witnesses regarding descriptions of the perpetrator's automobile, the perpetrator, the abduction, and the victim was based on facts recalled and related before hypnosis. Variances and inconsistencies between the witnesses' statements to the police shortly after the crime and their testimony at the retrial twelve years later did not

Rᴇꜰᴇʀᴇɴᴄᴇs

Am Jur 2d, Criminal Law § 389; Evidence §§ 574, 1019; Homicide § 72; Jury § 233; Witnesses § 173.

See ALR Index under Challenges to Jury; Change of Venue; DNA; Felony Murder Doctrine; Hypnosis and Hypnotists; Witnesses.

result in prejudice to the defendant in light of the strength of physical and other evidence and the safeguard of cross-examination.

2. Comments by the prosecutor during closing argument regarding evidence admitted pursuant to MRE 404(b) of a prior incident in which the defendant approached two schoolgirls were not improper. The prosecutor did not exceed the limited purpose for which the evidence was admitted, i.e., to show that the defendant committed the charged offense, in using the evidence to explain why the defendant used a knife and how he stalked and attracted the victim.

3. The trial court did not err in not excusing three jurors for cause. The plaintiff failed to establish that the jurors' state of mind would prevent them from rendering a just verdict, MCR 2.511(D)(4), or that they possessed opinions that would have improperly influenced the verdict, MCR 2.511(D)(5). The jurors assured the trial court that they could decide the case with open minds and on the basis of the evidence presented and the instructions given.

4. The trial court did not abuse its discretion in denying the defendant's request under MCR 6.412(E)(2) for additional peremptory challenges. The request was not timely, having been made after the jury was selected and sworn, and the defendant failed to show just cause for the additional challenges.

5. The trial court did not abuse its discretion in denying the defendant's motion for a change of venue based on pretrial publicity. The defendant failed to establish that a strong feeling against him existed in the community, that the publicity was so extensive and inflammatory as to preclude the impartiality of the jurors, that the jurors were actually prejudiced, or that the atmosphere surrounding the trial created a probability of prejudice.

6. A comment by the prosecutor during closing argument that reasonable doubt constituted doubt for which the jurors could give a reason, when reviewed in context, did not misstate or shift the prosecution's burden of proving guilt beyond a reasonable doubt.

7. The prosecutor stayed consistent with his theory of the case and did not argue facts that were not in evidence in explaining the testimony of certain witnesses regarding the defendant's location, which varied from the location shown by the prosecution, and in suggesting that the blonde hair found in the defendant's automobile was that of a female.

8. The prosecutor, in his remarks to the jury, did not vouch

for the defendant's guilt or for the integrity of the case against the defendant.

9. The trial court, in telling the jury not to acquit or convict on the basis of what the attorneys said, accurately stated the law and did not deny the defendant the right to present a defense.

10. The defendant was not denied his rights of confrontation and due process when witnesses from the first trial were not able to testify at the second trial. The defendant could have called those witnesses himself, and the prosecution was not responsible for calling witnesses whom the defendant believed might have supported his defense.

11. There was sufficient evidence in support of the conviction of felony murder. A rational trier of fact could have found on the basis of the evidence presented that the defendant kidnapped the victim and, in the course of the kidnapping and with the requisite intent, killed the victim.

12. The results of the polymerase chain reaction (PCR) method of deoxyribonucleic acid (DNA) testing that was conducted on hair found in the defendant's automobile and that indicated that the hair was from the victim were properly admitted into evidence by the trial court. The court, after conducting a hearing pursuant to *People v Davis,* 343 Mich 348 (1955), and *Frye v United States,* 54 US App DC 46; 293 F 1013 (1923), did not clearly err in finding that the PCR method is generally accepted in the scientific community as reliable in the forensic setting. Validation of the PCR method through independently conducted studies is not required in the absence of a disagreement in the scientific community about the reliability of the method. Errors caused by the Taq polymerase enzyme are insignificant. The prosecution in this case established that generally accepted laboratory procedures were followed to guard against erroneous test results caused by contamination of the test sample.

Affirmed.

1. CRIMINAL LAW — WITNESSES — HYPNOSIS.

The testimony of a hypnotized witness is inadmissible absent proof by clear and convincing evidence that the testimony is based on facts recalled and related before hypnosis.

2. CRIMINAL LAW — WITNESSES — HYPNOSIS.

The testimony of a hypnotized witness is admissible where it is based on facts recalled and related before hypnosis, even if the statement itself was obtained after hypnosis.

3. JURY — VOIR DIRE — CHALLENGES FOR CAUSE.

A trial court's improper denial of a challenge of a juror for cause results in error requiring reversal where the aggrieved party exhausted all peremptory challenges, the party demonstrated a desire to excuse another subsequently summoned juror, and the juror whom the party wished later to excuse was objectionable.

4. VENUE — CRIMINAL LAW — PRETRIAL PUBLICITY.

The existence of pretrial publicity, standing alone, does not necessitate a change of venue; to be entitled to a change of venue, a defendant must show that a strong feeling against the defendant exists in the community and that the publicity is so extensive and inflammatory that jurors cannot remain impartial, or that the jury is actually prejudiced or the atmosphere surrounding the trial will create a probability of prejudice.

5. HOMICIDE — FELONY MURDER.

Felony murder consists of the killing of a human being with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316; MSA 28.548.

6. CRIMINAL LAW — EVIDENCE — DNA Identification — Polymerase Chain Reaction.

Trial courts in Michigan may take judicial notice of the reliability of the polymerase chain reaction method of deoxyribonucleic acid (DNA) testing for identification; admission into evidence of the results of DNA testing using the polymerase chain reaction method requires a showing by the prosecution that generally accepted laboratory procedures were followed; a jury may consider the testimony of experts in determining the weight to be given to such DNA evidence.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *William A. Forsyth,* Prosecuting Attorney, and *Timothy K. McMorrow,* for the people.

State Appellate Defender (by *Charles J. Booker*) and Albert Lee, III, in propria persona, for the defendant on appeal.

Before: GRIBBS, P.J., and MARKMAN and D. E. SHELTON,* JJ.

MARKMAN, J. This case has had a long procedural history. Defendant was first tried and convicted of first-degree felony murder, MCL 750.316; MSA 28.548, in 1979. In 1983, this Court affirmed defendant's conviction (summary opinion, *Lee I*), but the Michigan Supreme Court remanded the case to this Court for reconsideration in 1985, *People v Lee*, 422 Mich 928 (1985) (*Lee II*). Defendant's conviction was again affirmed on remand (summary opinion, *Lee III*). The Michigan Supreme Court subsequently granted leave to appeal. In January 1990, the Court by a 4-3 vote reversed defendant's conviction and remanded this matter for a new trial. *People v Lee*, 434 Mich 59; 450 NW2d 883 (1990), cert den 498 US 879 (1990) (*Lee IV*).

This matter was retried in February 1991. On March 1, 1991, defendant was again convicted of first-degree felony murder. He was sentenced to mandatory life imprisonment without the possibility of parole. Defendant appeals as of right. We affirm.

This case involved the kidnapping and murder of Linda VanderVeen in Grand Rapids in February 1979. Linda was eleven years old and worked as a school safety at the corner of Orville and Rosewood Streets.

On the morning of February 12, 1979, Linda left for her post at approximately 8:00 A.M. Witnesses observed her abduction and reported it to the police. Tragically, Linda's body was found later in the afternoon on the same day, over a snow embankment near the Regency Park Apartments.

Linda's hands had been bound behind her back

---

* Circuit judge, sitting on the Court of Appeals by assignment.

and a sock was used to gag her mouth. The cause of death was strangulation with a necklace. She was killed at a location other than where her body was found and there was evidence that she had been sexually assaulted. The time of death could only be roughly estimated at between 9:00 A.M. and 1:00 P.M. on February 12.

Defendant was initially investigated in this matter on February 23 because he owned a car—a black Pontiac Grand Prix—similar to that observed by witnesses who saw the abduction.

Jack Hill was driving near Orville and Rosewood Streets on February 12 at about 8:05 A.M. when he noticed a black, shiny, two-door car parked on the wrong side of the road. He thought the car was a Chrysler model by its shape. Because he thought the car was stuck, Hill offered to assist the driver. He saw a well-dressed black male between twenty-five and thirty years old. The man was about five feet, eleven inches tall with neatly trimmed hair.

When Hill asked the man what he was doing, the man replied that it was none of Hill's business and that everything was all right. Hill looked in the back of the man's car and saw a young, white girl with blonde hair in the back seat, waving her arms at Hill. The girl looked frightened. Hill realized that something was wrong. Before he could do anything, the man in the car drove off and knocked Hill down with the car. Hill was able to follow the man to an intersection. The man drove through the intersection ignoring a stop sign, but Hill stopped at the intersection.

At about the same time, James Vos was driving his children to school and observed a black male driving a black Grand Prix at an excessive rate of speed fail to stop at a stop sign. Vos described the man as having a short Afro hairstyle and being

about twenty-five years old. As the driver of the Grand Prix turned a corner, he nearly struck Vos' car. Vos got out of his car. Hill approached Vos and informed him that the driver of the car had kidnapped a young girl down the street.

Vos and Hill tried to follow the car, but had to ask some boys, working as safeties, which way the car had gone. Greg Start first told the men that he did not see a black Grand Prix go by. Douglas Bowman told the men that he did see a black car. Vos and Hill did not see the car or driver again. Both men immediately reported the incident to the police.

Start later realized that he had, in fact, seen the black Grand Prix earlier that day and had incorrectly told Vos and Hill that he had not seen the car. He described the driver as a black male with a short Afro hair style and about twenty-five to thirty years old.

Vos' son, Jack Vos, saw a young girl with blonde hair in the back seat of the car as it sped by. He thought she was about eight to ten years old and had her mouth open as if she was screaming. The girl was also waving her hands. Jack recalled that the girl looked terrified. He later saw a picture of Linda VanderVeen and believed that the girl in the car was her. He also described the car as a black Grand Prix.

Jim Bonnema was driving his son to school on February 12 when, at approximately 8:17 A.M., he saw a black Grand Prix accelerating toward his car not far from Linda's post. He observed that the car was unusually clean for the weather conditions.

Residents of the Regency Park Apartments saw a black male drive a black, shiny, clean car into the parking lot of the apartments at a fast rate of speed at about 8:24 A.M.

Shortly after the kidnapping was reported, a police officer found a wood-handled kitchen knife in the snow at the intersection where Linda had been kidnapped.

Tim Wilcome and David Orr helped a black male who had his car stuck in the snow at the Georgetown Condominiums on a dead-end road at about 10:00 or 10:30 A.M. on February 12. Orr saw the man place something in a nearby dumpster before he left. Linda's knapsack was subsequently recovered from a dumpster at the Georgetown Condominiums on Wednesday, February 14. It was determined to have been placed there sometime between 8:00 A.M. on February 12 and noon on February 14.

The medical examiner found hair-like fibers on Linda's skin underneath her clothing. Some of the fibers, which were possibly hair, were black. Other fibers, which were pink or red, were found on both Linda's skin and clothing.

A sample of defendant's hair, when analyzed, showed that his hair was dyed black at the time of the kidnapping. Hairs that were found inside the victim's sock (which was used to gag her) and on her sweater were consistent with defendant's hair, including both the dye and that it was Negroid-type hair. Defendant was a likely source of the hair found in both the sock and the sweater.

The pink or red fibers found on the victim were identical to the fibers from the carpet in defendant's car. Fibers found inside the sock also matched the carpet in defendant's car.

A hair barrette was found in defendant's car, under the back seat, which matched the type that Linda wore in her hair to school the day she was killed. Feathers found in defendant's car also matched the type that were in Linda's mittens.

In a snow brush located in defendant's back seat, two long, blonde hairs were found intertwined in the bristles. Fourteen long, blonde hairs were also found in defendant's back seat. A visual inspection indicated that the hair was consistent with the victim's hair.

An expert in DNA[1] testing, Dr. Edward Blake of Forensic Science Associates (FSA), tested DNA found in one of the hairs on the snow brush in defendant's car. The DQ alpha genotype of the hair was the same as Linda VanderVeen's genotype. Dr. Blake therefore was of the opinion that the hair found in the snow brush could have come from the victim. Statistically, the victim's genotype was the same as about five percent of the Caucasian population. Dr. Blake therefore could not positively identify the hair as the victim's.

The jury also heard expert testimony from Dr. Bonnie Blomberg, a molecular geneticist and immunologist at the University of Miami School of Medicine. She also believed, on the basis of DNA testing, that the hair from the snow brush could have come from the victim.

I

Following defendant's initial conviction after a jury trial, the Supreme Court reversed and remanded this matter for a new trial because several of the eyewitnesses had been hypnotized in order to assist them in recalling facts about their observations. The Supreme Court held that "testimony of the hypnotized witnesses is inadmissible absent proof by clear and convincing evidence that the testimony being offered was based on facts recalled and related prior to hypnosis." *Lee IV, supra* at 86. The Court did not specify the testimony that

---

[1] Deoxyribonucleic acid.

was affected by its holding, but, in the course of its discussion, focused on the testimony concerning the identification of the defendant. *Id.* at 75-86.

At the time of the second trial, the court was faced with the difficult task of how to implement the Supreme Court's ruling.[2] Because a long time had passed, witnesses could not recall what they had originally related to police and others about this crime. Furthermore, police officers who took statements from the witnesses had no independent recollection of what the witnesses originally stated.[3]

The approach taken by the trial court was to allow witnesses to testify consistent with the substance of the statements they gave to the police before undergoing hypnosis. For this reason, the trial court did not think it was necessary to conduct extensive pretrial hearings. However, the court did choose to hear certain testimony before determining its admissibility. The defendant was afforded some leeway in this area, for instance for any exculpatory evidence that witnesses had not previously recalled and related.

Defendant disputes the admissibility of various testimony throughout the trial. Defendant apparently only objected below to two of the areas of inquiry that he raises on appeal. We recognize the inherent difficulty confronted by the trial court, as well as this Court, in analyzing testimony from

[2] The prosecutor conceded that witnesses who identified defendant at the first trial (witnesses Start, Hill, and Vos) would not be able to identify him at the second trial under the strictures set forth by the Supreme Court.

[3] In addition to the passage of time, it appears that substantial preservation of prehypnotic statements is lacking. *Lee IV, supra* at 78. We note, however, that the investigation in this case took place before *People v Gonzales,* 415 Mich 615; 329 NW2d 743 (1982), modified 417 Mich 968 (1983), and *People v Nixon,* 421 Mich 79; 364 NW2d 593 (1984), in which the Michigan Supreme Court addressed the admissibility of testimony of hypnotized witnesses, were decided.

witnesses who have been hypnotized. Both the prosecutor and defendant set forth reasonable arguments with respect to the source of the testimony, because one can hardly be certain regarding whether a variance in testimony, however minor, has resulted from faded memory, recollection of detail, nervousness, or any other reason found in trials not involving hypnosis, or from the effect of the hypnosis itself. The trial court was faced with the daunting task of determining whether the prosecutor had presented clear and convincing evidence that the testimony was based on facts recalled and related before hypnosis. We review the trial court's decision to admit this evidence for an abuse of discretion. See *People v Nixon,* 421 Mich 79, 91; 364 NW2d 593 (1984).

We believe the trial court generally applied the correct standards in attempting to determine the admissibility of the testimony of the hypnotized witnesses. While strict adherence to the police statements was not required by the Supreme Court, the police statements became vitally instructive in this case with respect to whether testimony was based on facts recalled and related before hypnosis. Trial testimony of a hypnotized witness is admissible where it is "based on facts recalled and related prior to hypnosis" even if the statement itself was obtained after hypnosis. See *People v McIntosh,* 142 Mich App 314, 321-322, n 5; 370 NW2d 337 (1985), aff'd in part, app den in part, 422 Mich 951 (1985).

Defendant objected at trial to the admission of testimony by hypnotized witnesses that there was nothing about the physical appearance of the defendant that could lead them to believe that he was not the person they saw. The prosecutor agreed that witnesses who were hypnotized would not be allowed to point to the defendant and

identify him as the person they saw. However, the prosecutor sought to make it clear that the witnesses could not exclude the defendant and, in fact, could not identify him one way or the other. Thus, the prosecutor sought a ruling allowing him to ask a sequence of questions based on the witnesses' general description of the perpetrator.[4] The trial court allowed such questioning.

We do not believe the trial court abused its discretion in allowing this. Defendant does not contest the admissibility of the general descriptions of the perpetrator. Furthermore, the Supreme Court in *Lee IV, supra* at 80, found that the witnesses had given descriptions of the man they saw before hypnosis. We do not believe that the testimony in response to the prosecutor's questions was inadmissible. This testimony generally constitutes logical answers to legitimate follow-up questions, all of which are based on facts recalled and related before hypnosis.

Defendant in particular points to the prosecutor's question to Jack Hill regarding whether there was "anything about the man here in the courtroom [defendant] that's different than the man you saw that morning?" We acknowledge that this question is different from the one originally proposed by the prosecutor. However, we

---

[4] The prosecutor requested that he be allowed to generally ask the following questions (with expected answers):

(1) "[C]an you tell me whether he was the person you saw driving the car that morning?" "No, I cannot."
(2) "Is there anything about him, as he sits here in court today, that would lead you to believe he is not the person you saw that morning?" "No there's not."
(3) In other words, "You can't say one way or the other?" "That's correct."

The prosecutor explained that these were questions that had been asked in the first trial of witnesses who did not and could not identify the defendant.

further note the witness' answer, "There's not, no. I can't identify him." From there, as the prosecutor had proposed, he asked, "In other words, what you're telling me is this happened quickly, and you can't tell me, one way or the other, whether that's him or not?" Hill answered, "Yes, sir." We do not believe that this testimony constituted an improper identification of the defendant. Furthermore, we believe for the reasons stated above that this testimony is based on facts recalled and related before hypnosis. The point is that these witnesses could not say one way or the other whether the defendant was the perpetrator.

Defendant also objected below to Hill's description of the girl waving her arms. The police report indicated that Hill observed a black male force a young white female into the back seat as she resisted. Defendant argued that Hill never told the police that he saw the girl waving her arms at Hill. The trial court was convinced that the differences between Hill's statement and his testimony were not significant because defendant denied committing the crime. The trial court further noted that cross-examination was available to defendant. Thus, the trial court did not find this testimony to be prejudicial to defendant. We find Hill's statement to be similar to and fully within the scope of the relatively thorough description he gave to the police. Moreover, we agree with the trial court that this statement is not prejudicial to the defendant. We therefore do not believe error requiring reversal has been shown.

Defendant further points to a number of variances and contradictions to which he apparently did not object below. This Court may consider such issues, brought for the first time on appeal, if the errors could have been decisive of the outcome. *People v Grant,* 445 Mich 535, 553; 520 NW2d 123

(1994). ("[A] plain, unpreserved error may not be considered by an appellate court for the first time on appeal unless the error could have been decisive of the outcome or unless it falls under the category of cases, yet to be clearly defined, where prejudice is presumed or reversal is automatic.")[5]

Defendant argues that, when Hill testified, he gave additional details with respect to his description of the man and the car the man was driving. Defendant claims that Hill testified that the man was well dressed and had an Afro, estimated the man's weight and testified regarding the position of the vehicle and that it knocked him down. On the basis of Hill's descriptive report to police of the man and the incident, including where the cars (both his and the man's) were located and the direction they went, we believe that this testimony was based on facts recalled and related before hypnosis.

Defendant further argues that the testimony of Greg Start, Jim Bonnema, and James and Jack Vos comparing the defendant's car in a photograph with the car they saw that morning (or the identification of the defendant's car) was not based on facts recalled and related before hypnosis.[6] However, these witnesses testified at trial regarding the car they saw. With the slight exception noted below, defendant does not contest these descriptions as being outside the purview of facts recalled and related before hypnosis. In fact, as the dissent observed in *Lee IV, supra* at 104, the defendant's expert testified in the first trial that the description of the car by James and Jack Vos,

---

[5] The Supreme Court's decision in *Lee* rested upon the unreliability of posthypnotic testimony under the Michigan Rules of Evidence, not upon any constitutional defect. *Lee IV, supra* at 72-86.

[6] With respect to the testimony of Jack Vos, defendant actually points to testimony defendant himself elicited on cross-examination.

Start, and Bonnema was not influenced by hypnosis. In this case, a comparison (or identification) of the car was based on facts recalled and related before hypnosis; it was not necessary that the witnesses had made the actual identification before hypnosis. *McIntosh, supra.* Defendant contests that portion of Bonnema's description of the car at trial as a 1976 or 1977 Grand Prix as it varied from his description to police of a "newer Grand Prix." Although not identical to his description to the police, we nevertheless find that this testimony was based on facts recalled and related before hypnosis.

Defendant also contests the description of the car by Timothy Wilcome and David Orr. Defendant states that both witnesses had told the police that the car driven by the man was a Monte Carlo. Defendant claims, however, that Wilcome's testimony that the "body shape" of the man's car was similar to that of defendant's was not based on facts recalled and related before hypnosis. However, Wilcome's description of the car as a Monte Carlo before hypnosis would provide the basis for his comparison of a car's "body shape." Thus, we believe that Wilcome's statement was based on facts related and recalled before hypnosis, namely, his description of the car to the police.

Defendant further claims that David Orr testified during the first trial and before hypnosis that the car was a Monte Carlo yet testified during the second trial that the car could have been a Grand Prix or a Monte Carlo. Defendant argues that Orr's equivocal testimony at trial supported the prosecutor's theory that Wilcome and Orr were simply mistaken in their identification of the car. As defendant points out, however, Orr's statements before hypnosis and at the first trial, after hypnosis, were consistent. It was not until the

second trial, approximately eleven to twelve years after the first trial, that the discrepancy in his testimony appeared. We believe that the lapse in time, rather than the hypnosis, was the cause of the discrepancy. In fact, Orr explained that by the time of the second trial he could not remember what the car looked like although he admitted that he testified at the first trial that it looked like a Monte Carlo. Defendant was fully able to explore any inconsistencies in Orr's testimony through cross-examination. Admission of the testimony was not error.

The mere presence of inconsistencies and variances do not automatically render testimony inadmissible as not being based on facts recalled and related before hypnosis. We further stress the importance of cross-examination in dealing with inconsistencies, especially where a substantial lapse of time may be the real cause of the inconsistency. As previously stated, the testimony at trial need not be identical to the police statements to be admissible under *Lee IV*; it must, and we believe it was in this case, based on facts recalled and related before hypnosis. Any inconsistencies or variances that may have occurred in testimony before and after hypnosis in this case would have been viewed as entirely unremarkable had they occurred in the context of varying statements made in a case not involving hypnosis. This is especially true where varying statements have been made twelve years apart. Moreover, questioning by the prosecutor involving comparisons of the man driving the car and the car constituted logical follow-up questioning in light of the testimony given. Nevertheless, even if the admission of these variances and inconsistencies was error, they by no means constitute error requiring reversal. The slightness of the variances and inconsistencies,

coupled with the safeguards of cross-examination, rendered any errors harmless.

In *Lee IV, supra* at 86-90, the Supreme Court cited and followed the standards defined in *People v Young (After Remand)*, 425 Mich 470, 505; 391 NW2d 270 (1986), in its harmless-error analysis.

> As an appellate court, we do not independently evaluate this evidence. "[I]t is not the appellate court's function to determine guilt or innocence. . . . Those judgments are exclusively for the jury . . . . " Our responsibility is to determine how the error might have affected the jury's decision. The inquiry is "what effect the error had or reasonably may be taken to have had upon the jury's decision."
>
> If it were clear that the erroneous admission of the . . . evidence did not prejudice [the defendant] the error would be harmless. [*Citing Kotteakos v United States*, 328 US 750, 763-764; 66 S Ct 1239; 90 L Ed 1557 (1946).] [*Lee IV, supra* at 86-87.]

Any error or combination of errors in this case was not prejudicial to defendant. The errors would merely concern the incremental or marginal testimony itself, not the complete testimony of the particular witness on the subject matter in controversy. Testimony of witnesses' regarding descriptions of the car, driver, and the incident itself, including the observations of the young girl, absent the relatively minor variations, would still have been heard by the jury. There was also significant physical evidence in this case, including the barrette and feathers found in defendant's car, the dyed hairs found inside the victim's sock and on her sweater, the carpet fibers found on the victim and inside her sock, and the long blonde hairs found in defendant's car. One of these hairs was further subjected to DNA tests that determined that the hair could have come from the victim.

Given this and other evidence presented at trial, we believe that the exclusion of the variances in the testimony would not have affected the jurors' decision. When evaluated in the full context of the evidence presented in this sixteen-day trial, we further believe that any error or combination of errors was not decisive of the outcome.

II

Defendant next argues that misconduct by the prosecutor occurred when the prosecutor, during closing arguments, improperly referred to a prior incident involving defendant. Defendant did not object below to the argument. This Court's review is therefore precluded absent a miscarriage of justice or unless a cautionary instruction could not have cured the prejudicial effect. *People v Stanaway,* 446 Mich 643, 687; 521 NW2d 557 (1994).

The trial court admitted evidence under MRE 404(b) to show defendant's pattern or plan for committing child abductions and that defendant committed this crime. The jury heard evidence that, as two young girls were walking to school only six days before Linda VanderVeen was kidnapped, defendant stopped his car and asked the girls for the time and directions. The girls ran after defendant motioned for one of the girls to come over to his car and asked if she was scared of him.

The prior bad acts evidence was admitted for the limited purpose of showing that defendant committed the crime at issue in this case. During closing arguments, the prosecutor argued that the evidence could explain why defendant might have used a knife as part of his plan to abduct Linda VanderVeen. He made further arguments that, in this Court's judgment, were relevant to show de-

fendant's "manner and circumstances of stalking and attracting victims." *Lee IV, supra* at 94-95. Unlike the first trial, the evidence was not used to show that defendant earlier had attempted to commit a crime and that, in the instant case, he was acting consistent with that propensity. The prosecutor did not, for example, suggest that either of the girls had nearly been killed or that defendant had attempted to assault the girls, as may have been suggested in the first trial. The prosecutor also did not inordinately emphasize or focus undue attention upon the fact that defendant earlier may have attempted to abduct the two girls. We do not agree with defendant that the prosecutor's use of the evidence exceeded the limited purpose allowed under MRE 404(b).

The trial court instructed the jury on more than one occasion with regard to the limited use of the prior bad acts evidence. Any error here could have been cured by a further cautionary instruction had defendant objected to the statement. *Stanaway, supra.*

Even if the prosecution's argument was erroneous, it added little, if anything, to the jury's consideration of the evidence. The jury heard other evidence that a knife had been found near the area where Linda VanderVeen was kidnapped. The jury could have inferred from that evidence alone that a knife was used to accomplish the kidnapping. The jury did not need to determine why defendant would use a knife to commit this crime since it had sufficient information available to it that defendant, in fact, had used such a weapon.

Defendant further argues that the prosecutor deliberately injected an improper argument concerning the prior encounter with the two girls. He argues that the Supreme Court previously held

that the prosecutor had improperly used prior bad acts evidence at the first trial. Defendant therefore contends that the prosecutor deliberately ignored the Court's decision when he again employed the same evidence in an overly broad manner.

A prosecutor may not intentionally inject inflammatory arguments with no apparent justification except to arouse prejudice. *People v Bahoda,* 448 Mich 261, 266; 531 NW2d 659 (1995). We find defendant's assignment of error to be without merit.

First, as already noted, the purpose behind the prosecutor's use of the "bad acts" evidence in the case at bar was different in kind from his use of the evidence in the earlier trial. *Lee IV, supra* at 95-96. Second, the Supreme Court granted leave only to address whether the similar acts evidence was properly admitted. *Id.* at 63. Justice BRICKLEY, in his opinion, discussed the prosecution's closing argument only in relation to his analysis of the admissibility of the similar acts evidence. *Id.* at 95-97. A majority of the justices did not express agreement with Justice BRICKLEY's discussion of the propriety of the prosecutor's remarks. *Id.* at 97, 104.[7] Thus, the propriety of the prosecutor's closing argument during the first trial was not an issue decided by a majority of the justices. Accordingly, we would not infer an intent to deliberately disregard the Supreme Court's decision on these

[7] Defendant contends that Justices CAVANAGH's and ARCHER's votes constitute the third and fourth votes on this issue, in addition to the votes of Justice BRICKLEY and Justice LEVIN. We disagree. Neither Justice CAVANAGH nor Justice ARCHER expressed an opinion on the propriety of the prosecution's closing argument. Justice CAVANAGH, joined by Justice ARCHER, dissented with regard to the portion of Justice BRICKLEY's opinion where the closing argument was discussed. 434 Mich 97. As long as it would not be illogical for Justices CAVANAGH and ARCHER to reject the admissibility of the MRE 404(b) evidence yet concede the propriety of the prosecutor's closing argument if such evidence *were* admissible, we decline to read the minds of these justices.

facts, even if the prosecutor's arguments were improper, which we do not find them to be.

### III

Defendant next argues that the trial court denied him his right to a fair trial by (1) forcing him to use peremptory challenges to excuse jurors that should have been dismissed for cause, (2) refusing to grant defendant's request for additional peremptory challenges, and (3) refusing to change venue because an impartial jury had not been seated.

There was substantial concern over publicity in this case, even though it was retried twelve years after the crime was committed. Many members of the venire recalled facts from 1979 when the crime was committed, as well as facts from the first trial. The trial court conducted the voir dire on publicity and recollection of the first trial outside the venire's presence, by taking the jurors individually into the jury room. The court complied with the guidelines subsequently set forth in *People v Tyburski,* 445 Mich 606, 621-624; 518 NW2d 441 (1994) (opinion of MALLETT, J.), by asking the jurors what they had heard about the instant case and about any attitudes the jurors may have developed. The court then independently decided if the jurors could be impartial.

On appeal, defendant challenges the trial court's decision not to remove three jurors for legal cause: Juror N, Juror O, and Juror F.[8]

A four-part test is used to determine whether an error in refusing a challenge for cause merits reversal. There must be a clear and independent showing on the record that (1) the court improp-

[8] The jurors' initials are used here to protect their privacy. Juror O and Juror F were peremptorily excused by defendant. Juror N was not.

erly denied a challenge for cause, (2) the aggrieved party exhausted all peremptory challenges, (3) the party demonstrated the desire to excuse another subsequently summoned juror, and (4) the juror whom the party wished later to excuse was objectionable. *People v Legrone,* 205 Mich App 77, 81; 517 NW2d 270 (1994). Defendant failed to expressly challenge any of the three jurors for cause. However, we will briefly review the trial court's decisions to determine if it properly found that the jurors could be impartial, because in at least one instance defendant alleges that he did not have the opportunity to object before the court ruled.

Juror N was not influenced by the publicity over this case because she was too young (age fourteen or fifteen) to recall much about the case and had not read or heard any of the more recent publicity. However, Juror N did express some concern about her ability to keep in mind that defendant was presumed innocent. Despite some concerns that it might be difficult for her to do so, Juror N assured the court that she could be fair, would follow the court's instructions, and would decide the case exclusively on the basis of the evidence.

We find no error with the trial court's decision not to excuse Juror N for cause. Juror N did not indicate that she had a state of mind that would prevent her from rendering a just verdict. MCR 2.511(D)(4). Nor did she possess opinions that would have improperly influenced the verdict. MCR 2.511(D)(5). Rather, she stated—apparently credibly to the trial court—that she would decide the case consistent with the requirements of the law. The court therefore was not required to dismiss her for cause. *Legrone, supra* at 81-82; *People v Lamar,* 153 Mich App 127, 135; 395 NW2d 262 (1986).

Juror O had followed the first trial, although not

particularly closely, and recalled that defendant was convicted. She followed the trial because she had two small children and was concerned about the kidnapping. While Juror O denied forming an opinion concerning defendant's guilt or innocence, she thought that "as a mother back then I felt relief." She explained that it was a scary time in the community for those with young children. However, she could not remember details about the case.

Juror O assured the court that she could decide the case with an open mind on the basis of the evidence and the instructions. She further stated that she would not let an earlier jury decision sway her. The trial court did not err in not removing her for cause due to her cognizance of the first trial. *Legrone, supra; People v Passeno,* 195 Mich App 91, 98-99; 489 NW2d 152 (1992).

Juror O was also married to a Grand Rapids police officer and apparently knew or knew of some of the police witnesses. There is no indication on the record of the nature of this familiarity. Defendant, despite his burden to show a basis for the juror's disqualification, does not raise anything beyond the fact that Juror O was married to a policeman and responded that she knew or knew of some of the witnesses. Juror O assured the court that, despite the fact that she "knew of" these witnesses, she could make an independent decision. Her responses during voir dire did not require her removal for cause. Cf. *People v Walker,* 162 Mich App 60, 64-65; 412 NW2d 244 (1987) (fact that juror is a police officer himself is not sufficient to warrant an inference of bias, but nature of his relationships with prosecutors and police witnesses may give rise to such an inference).

Juror F also followed the first trial closely. She thought that defendant was guilty at the time and recalled that he was convicted, but did not remember many details. At the time of this trial, Juror F did not have any definite opinions about defendant's guilt or innocence. She thought that the retrial was occurring possibly because "there was another man involved that said that he admitted he was guilty." She assured the court that she could put out of her mind what she knew about the first trial.

The record does not support defendant's argument that Juror F should have been dismissed for cause. MCR 2.511(D)(4). Juror F had not formed a definite opinion about defendant's guilt at the time of trial and promised to keep an open mind. Although she previously believed that defendant was guilty at the time of the first trial, she did not recall details of the case. It therefore would not have been difficult for Juror F to set aside her previous opinion. The trial court was also in the best position to judge, on the basis of their credibility and demeanor, whether Juror F and the other members of the venire could render a fair and impartial verdict. Legal cause for Juror F's dismissal was not shown. *People v Roupe,* 150 Mich App 469, 474; 389 NW2d 449 (1986).[9]

On the basis of the foregoing, and the absence of objection by the defendant, he has not met the first prong of the test for reversal for failure to strike a juror for legal cause. *Legrone, supra* at 81.

---

[9] Although it is unclear whether defendant also contends that another juror, M, should have been stricken for legal cause, he is alluded to in defendant's brief on appeal. Juror M did not have any clear recollections about the first trial (indeed, he was unaware of the verdict) and communicated an open mind in considering the evidence at the second trial. The fact that his wife had spoken to him briefly about an article appearing in the newspaper about the case before jury duty does not, in our judgment, constitute legal cause for his removal. Juror M was later stricken by peremptory challenge.

Error requiring reversal therefore has not been shown.

We also do not believe that defendant was improperly denied additional peremptory challenges under MCR 6.412(E)(2). The defendant's "request" for such additional challenges was made at the same time as the motion for a change of venue. At that time, defense counsel stated as follows:

> If I would have had additional challenges, I would have removed a lot of the jury members that are now seated in this jury, and we would ask the Court to change the venue of this trial. I feel it is not a fair and impartial jury to Mr. Lee.

The motion, and thus defendant's request for additional challenges, was not raised until after the jury had been selected and sworn. Not only was it too late at that juncture to make such a request, but there was no showing of just cause for additional challenges. The trial court pointed out that it excused for cause those prospective jurors who "had any hesitancy of remembering too much about the case or those who indicated any real knowledge of the case . . . ." In fact, the trial court excused for cause twenty prospective jurors. Of the twenty, fourteen were excused because of prior knowledge of the case or because of general bias or prejudice and six were excused for other reasons. The trial court did not abuse its discretion by refusing to grant additional peremptory challenges under MCR 6.412(E)(2).

Defendant has also not shown that the trial court abused its discretion by denying the motion for a change of venue because of the amount of publicity. The denial of a motion for a change of venue is reviewed to determine whether there has been an abuse of discretion. *Passeno, supra* at 98.

The existence of pretrial publicity, standing alone, does not necessitate a change of venue. *Id.*

Defendant has not shown the existence of a strong community feeling against him or publicity so extensive and inflammatory that jurors generally could not remain impartial. *Passeno, supra; People v DeLisle,* 202 Mich App 658; 509 NW2d 885 (1993). Defendant has further failed to show that the impaneled jury was actually prejudiced or that there was an atmosphere that created a probability of prejudice. *Id.* The trial court examined each prospective juror separately to determine whether each had any prior knowledge of the case. As previously discussed, several potential jurors were in fact dismissed for cause because of prior knowledge, prejudice, or bias. We believe that an impartial jury was selected. The trial court reasoned in part, "I think that at least as it comes to pretrial publicity, the fifteen people we have are as untainted as you're going to find anyplace in the state." Given this determination, the trial court did not abuse its discretion in denying the motion for a change of venue.

IV

Defendant filed a motion with this Court to be allowed to submit a supplemental brief. We granted the motion and discuss in this section the issues raised in the supplemental brief filed by defendant in propria persona. Defendant first argues that he was denied a fair trial because of alleged misconduct by the prosecutor. Because there was no objection below to the alleged misconduct, this Court's review is precluded absent a miscarriage of justice or if a cautionary instruction could not have cured the prejudicial effect. *Stanaway, supra* at 687.

Defendant contends that misconduct by the prosecutor occurred during closing arguments when the prosecutor effectively told the jury that reasonable doubt constituted a doubt for which they could give a reason. Defendant cites *People v Foster,* 175 Mich App 311; 437 NW2d 395 (1989), in which this Court reversed the defendant's convictions on the basis of a series of acts of misconduct by the prosecutor. In *Foster,* one of the remarks made by the prosecutor during closing arguments was that the prosecutor did not have to prove defendant's guilt "beyond a reasonable doubt, not even beyond a shadow of a doubt." The prosecutor then stated that "you have to have a reason for the doubt before you can call it a reasonable doubt." This Court found that these instructions had the effect of improperly shifting the burden of proof. *Id.* at 319.

Defendant does not contend that, as was the case in *Foster,* the prosecutor ever stated that he did not have the burden to prove the case beyond a reasonable doubt. Further unlike in *Foster,* there was no series of acts of misconduct by the prosecutor. Instead, the defendant claims that the burden was effectively shifted by the isolated definition of "reasonable doubt" posed by the prosecutor. We do not believe that the prosecutor's statements, in context, in this case misstated the jury's obligations. In any event, the jury was properly instructed by the court regarding what constitutes a reasonable doubt.

Defendant next argues that the prosecutor argued facts not in evidence when the prosecutor suggested various theories to explain the testimony of Orr and Wilcome, which, defendant states, placed the assailant not far from where the body was found at about the time the prosecution claimed defendant was purchasing license plates.

A prosecutor may not argue facts not entered into evidence. *Stanaway, supra* at 686. However, the prosecutor is "free to argue the evidence and all reasonable inferences from the evidence as it relates to [the prosecutor's] theory of the case." *Bahoda, supra* at 282.

The prosecutor argued several possibilities with respect to Orr and Wilcome, including that perhaps the man whom Orr and Wilcome assisted in the snow was not the assailant or that perhaps Orr was mistaken about the car he saw. These possibilities constituted part of the prosecutor's theory based on the evidence. The prosecutor may relate the facts to his theory of the case. The prosecutor further argued that Orr and Wilcome "didn't know at the time what time this was." The prosecutor apparently drew this inference on the basis of his further statements that "[t]hey're busy, they're cleaning, they're plowing some guy's truck, they pull him out, and away they go. They're frankly not paying much attention to it."

The defendant further argues that the prosecutor argued facts not in evidence when he suggested that the blonde hair probably came from a female.[10] However, this argument did not constitute a statement of facts not in evidence. Instead, the prosecutor made this argument on the basis of the testimony of witness Edward Gundy, a crime laboratory scientist, who opined that because of its length, the hair probably came from a female.

Defendant next argues that the prosecutor vouched for the defendant's guilt and for the

[10] Defendant actually claims that the prosecutor stated that the hair found in defendant's car "must have come from a female, and that for this reason, his own expert's statistics based upon the DNA evidence, were wrong." However, it appears that the prosecutor stated that it probably came from a female on the basis of its length and the opinion of a witness. The prosecutor then proceeded to continue his argument with the assumption that it was a hair from a female.

integrity of the case against defendant when the prosecutor told the jury that the defendant was there because he was guilty and that the prosecutor was trying to get at "what the truth is." We disagree. The prosecutor in his remarks to the jury said nothing more than that, on the basis of the facts as the prosecutor understood them, defendant was guilty of the crime charged. There was nothing inappropriate about these statements.

Defendant also argues that the trial judge denied him his right to present a defense when he told the jury that "you cannot acquit or convict based upon what the attorneys say." Defendant contends that the trial court effectively instructed the jury that they could not acquit defendant if they believed defense counsel's interpretation of the evidence. Defendant claims that, in light of the fact that defendant presented almost no evidence of his own, the only defense the jury could consider was contained in the defense attorney's closing argument.

We disagree with defendant's argument. Before closing arguments, the court, among other things, told the jury that "what the attorneys say is not evidence, and you cannot acquit or convict based upon what the attorneys say." The court further told the jurors that if they remembered something different than the attorney had remembered, they should rely on their own memory and not that of the attorney. The court continued:

So listen carefully to what they [attorneys] have to say to you, but bear in mind that ultimately the decision becomes yours, the twelve of you who are left, and that decision has to be based upon what you heard from the witness stand, what you glean from the various exhibits which have been admit-

ted, and from other things which I tell you [that
you] can or should consider as evidence.

The court's instruction in this regard is standard
and accurately states the law. It did not deny
defendant's attorney any right of argument, but
merely instructed the jurors that their own recol-
lection of the factual evidence was controlling, not
those of the attorneys.

The defendant next argues that he was denied
his rights of confrontation and due process when
witnesses from the first trial were not able to
testify in the second trial. We disagree. The defen-
dant has a constitutional right to be confronted
with the witnesses against him. However, defen-
dant does not claim that he was denied the right
to confront witnesses whose testimony in some
form was considered by the jury. Instead, defen-
dant claims that various individuals should have
been called to testify in the second trial. Defen-
dant does not explain why he was unable to call
these individuals on his own. *People v Cross,* 202
Mich App 138; 508 NW2d 144 (1993). Thus, there
has been no violation of defendant's right to con-
frontation[11] or due process. While the prosecutor
has certain obligations with respect to witnesses, it
is not the prosecutor's responsibility to call any

---

[11] In *People v Frazier (After Remand),* 446 Mich 539, 543-544; 521
NW2d 291 (1994), a plurality opinion, Justice BRICKLEY, quoting
*California v Green,* 399 US 149, 156; 90 S Ct 1930; 26 L Ed 2d 489
(1970), noted the origins of the Confrontation Clause:

"[T]he particular vice that gave impetus to the confrontation
claim was the practice of trying defendants on 'evidence' which
consisted solely of ex parte affidavits or depositions secured by
the examining magistrates, thus denying the defendant the
opportunity to challenge his accuser in a face-to-face encounter
in front of the trier of fact."

witness whom the defendant believes may support his defense in some way.[12]

Defendant further argues that the prosecutor failed to prove all elements of felony murder.[13] Felony murder consists of

> "(1) [t]he killing of a human being (2) with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316; MSA 28.548." [*People v Thew,* 201 Mich App 78, 85; 506 NW2d 547 (1993), quoting *People v Bush,* 187 Mich App 316, 327; 466 NW2d 736 (1991).][14]

The underlying felony involved in this case is kidnapping, a felony enumerated in MCL 750.316; MSA 28.548. Defendant appears to argue that there was insufficient evidence to support his conviction. In reviewing the sufficiency of the evi-

---

[12] Defendant stresses the absence of testimony from Billy Mansfield, Jr., and the effect on the juror who defendant claims remembered his testimony from the first trial. Ironically, Mansfield testified that, while he and defendant were temporarily cellmates, defendant had confessed to him that he had committed the crime. In the course of defendant's argument, he further points to the recollection of Juror F. Juror F thought that the retrial was occurring possibly because "there was another man involved that said that he admitted he was guilty." However, it is unclear whether Juror F was referring to defendant's alleged confession to Mansfield or whether Juror F incorrectly recollected that a mistrial may have occurred because another individual admitted his own responsibility for the crime. In any event, Juror F assured the court that she could put out of her mind what she knew about the first trial and committed to keep an open mind.

[13] Defendant incorrectly states the elements of felony murder as "who, what, whom, when, why and how." Defendant further claims that the jurors "chose" not to consider these "elements." The jury should have, and presumably did, consider the elements as instructed by the trial court.

[14] MCL 750.316; MSA 28.548 was amended slightly by 1980 PA 28, presumably after the offense was committed in this case. However, that amendment does not appear to affect this case in any way.

dence, this Court must view the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Wolfe,* 440 Mich 508, 515; 489 NW2d 748 (1992), modified on other grounds 441 Mich 1201 (1992).

On the basis of the evidence presented, we conclude that a rational trier of fact could have found that the essential elements of felony murder were proven in this case. As we discussed earlier, substantial testimonial and physical evidence was presented at trial in support of the defendant's conviction. A reasonable trier of fact could have found that defendant kidnapped Linda Vander-Veen and that, while committing this offense and with the requisite intent, he killed her.

Defendant's final argument deals with the propriety of testimony by witnesses who had been hypnotized. Defendant focuses on testimony regarding identification of his car through the use of photographs, as well as identification of the defendant himself as the assailant. We addressed these issues earlier in section I.[15] However, defendant further appears to argue that the identifications and comparisons made by witnesses were inconsistent with their "first statements" or descriptions

[15] Defendant does not specify any particular witness, but instead argues the inadmissibility of all such identifications or comparisons. As we discussed in section I, the prosecutor agreed at trial that witnesses who were hypnotized would not be allowed to point to the defendant and identify him as the person they saw. Defendant has not pointed to any such identification. With respect to an identification or comparison of the car, we found in section I that the identifications or comparisons by those witnesses that defendant identified in his appellate brief were based on facts recalled and related before hypnosis. In defendant's supplemental brief, he does not point to an identification or comparison made by any particular witness. We do not believe an identification or comparison of the defendant's car is inadmissible per se because the testifying witness has been hypnotized. We further do not believe that this is what the Michigan Supreme Court meant in *Lee IV, supra.*

(before hypnosis). For instance, defendant claims that while witnesses testified that there was no difference between the car they saw and the defendant's car in the photograph, a comparison of witnesses' "first statement" and defendant's car reveals substantial differences. Defendant contends that "these witnesses' first statements" were of a black 1976 Grand Prix with black interior and no red pinstripe on the side. Defendant then points to the difference between that description and the actual description of his car as a black 1977 Grand Prix with red interior and red pinstriping. Defendant does not identify "these witnesses," nor does he provide citation to the record. He seems to suggest that *all* the witnesses testified in this manner. However, this is untrue. For instance, witness Greg Start testified that there was "no difference" in the car he saw and the car in the photograph. This was based on facts recalled and related before hypnosis, namely, a description of the car given by Start to the police before hypnosis. At that time, he described the car as a black Grand Prix with a red pinstripe and red interior. He further described the car as new and clean. Thus, defendant's general statement about the witnesses is not true. Defendant has failed to point to any identification or comparison that was not based on facts recalled and related before hypnosis.

Defendant further contends that witnesses who had described the assailant as "clean shaven, no facial hairs" nevertheless identified defendant who "has a thick mustache and sideburns." Defendant has not shown by whom or when these descriptions were given, nor has he pointed to any such identification at trial. As we discussed, the prosecutor conceded that witnesses who had been hypnotized could not identify the defendant. Although,

as discussed in section I, the prosecutor asked questions to establish that witnesses could not say one way or the other whether the defendant was the perpetrator, defendant has not shown how the answers to those questions were not based on facts recalled and related before hypnosis. Defendant also contends that hypnosis tainted the "line-ups and photo books." However, defendant has not pointed to any particular testimony that he believes was inadmissible as a result, nor has he shown why such testimony would in fact be inadmissible.

V

Defendant's final issue on appeal concerns the trial court's decision to admit the DNA evidence linking the hair found in defendant's car to the victim. While this Court held that DNA evidence is admissible in *People v Adams,* 195 Mich App 267; 489 NW2d 192 (1992), modified in part on other grounds 441 Mich 916 (1993), under the *Davis-Frye* rule,[16] this case involves a significantly different method of DNA testing than was addressed in *Adams.* In *Adams,* this Court determined that results from the restriction fragment length polymorphisms (RFLP) method were admissible. This case, however, involves the polymerase chain reaction (PCR) method. Because of the significantly different methods of DNA testing, this panel is not bound to follow *Adams* on this issue pursuant to Administrative Order No. 1994-4. Rather, the PCR method must be subjected to separate scrutiny under *Davis-Frye* in order to determine whether there is "general acceptance" in the scientific community for this particular method of DNA analysis.

[16] *People v Davis,* 343 Mich 348; 72 NW2d 269 (1955); *Frye v United States,* 54 US App DC 46; 293 F 1013 (1923).

*People v Young (After Remand),* 425 Mich 470, 473, 479-480; 391 NW2d 270 (1986).

### A

Because the PCR method had not yet been the subject of an appellate decision in this state, the trial court conducted a *Davis-Frye* hearing in September and October 1990. Under the *Davis-Frye* rule,[17] novel scientific evidence must be shown to have gained general acceptance in the scientific community in order to be admissible at trial. *Young, supra* at 473, 479-480. The party offering the evidence has the burden of demonstrating its acceptance in the scientific community. *People v Davis,* 199 Mich App 502, 512; 503 NW2d 457 (1993).

In order to be admissible, the novel scientific evidence must have achieved general scientific acceptance for reliability, as supported by disinterested and impartial experts. *Young, supra* at 473, 479. The experts' livelihood must not be intimately connected with the new scientific technique. *Id.* at 483. Courts will not require that scientific tests be infallible to be admissible. Only reasonable certainty must follow from the tests. *Adams, supra* at 276.

At the *Davis-Frye* hearing, the prosecution presented four independent expert witnesses: Dr. David Ginsburg, Dr. Paul Coussens, Dr. Bonnie Blom-

---

[17] The prosecution urges this Court to follow *Daubert v Merrell Dow Pharmaceuticals,* 509 US —; 113 S Ct 2786; 125 L Ed 2d 469 (1993), and replace the *Davis-Frye* standard. However, we are bound to continue to follow this standard until the Michigan Supreme Court overrules or modifies its decisions in this area. *Boyd v W G Wade Shows,* 443 Mich 515, 523; 505 NW2d 544 (1993); *People v Bullock,* 440 Mich 15, 27; 485 NW2d 866 (1992). Furthermore, it is unnecessary to assess the DNA evidence in this case under the more relaxed Supreme Court standard because it is determined here to be admissible under even the more rigorous *Davis-Frye* standard.

berg and Dr. Julian Adams.[18] The prosecution also called Dr. Edward Blake of FSA, a forensic serologist, who performed the DNA testing in this matter. Defendant presented one expert witness, Dr. Ashok Bhagwat.

As background information on how DNA testing is performed, the following description of DNA structure from *Adams, supra* at 270, is helpful.

> Before reviewing the laboratory procedures, an understanding of the structure of the DNA molecule is necessary. The molecule is a double helix, shaped like a twisted ladder. Phosphate and deoxyribose sugar form the rails of the ladder. Four chemical bases—Adenine (A), Cytosine (C), Guanine (G), and Thymine (T)—lie next to each other on the sugar links along the sides of the ladder. Each A always bonds with a T on the other side of the ladder, and each C always bonds with a G on the other side of the ladder, so that the possible base pairs on the ladder are A-T, T-A, C-G, and G-C. The base pairs are connected by a hydrogen bond, such that the bonds form the rungs of the ladder. There are approximately three billion base pairs in one DNA molecule. Although no two human beings have the same sequence of base pairs (except for identical twins), we share many sequences that create common characteristics such as arms, legs, fingers, and toes. The sequences of variation from person to person are known as polymorphisms. They contain different alleles, which are alternate forms of a gene capable of occupying a single location on a chromosome. Polymorphisms are the key to DNA identification because they create the individual characteristics of everyone and are detectable in laboratory testing.

For a more detailed explanation of DNA testing,

---

[18] Dr. Adams primarily addressed genetic-population studies, which are only relevant to the resulting statistical information on DNA test results. Defendant has not challenged that portion of the trial court's ruling.

see anno: *Admissibility of DNA identification evidence,* 84 ALR4th 313.

The specific legal inquiry centered on whether the DNA evidence was reliable enough for forensic use. It was uncontroverted that the method was accepted as reliable for medical and biological research in the general scientific community. At the time of this hearing, only one laboratory, FSA, was regularly performing the PCR test for forensic use. As a result, there was obviously little evidence offered on the forensic use of the PCR method by those who actually used the method for forensic testing.

In the trial court, the challenge to the admission of this evidence centered on two specific areas. First, it was argued that the test results for the PCR method were not reliable because of errors caused by one of the enzymes used in the process, Taq polymerase. Second, it was argued that potential contamination at the crime scene or in the laboratory made the test unreliable for forensic use. We will address these arguments separately after discussing the scientific reliability of the PCR method in general.

The PCR method was first devised in 1985 and achieved widespread acceptance within one or two years. By 1990, it was one of the most widely used techniques in medical and biological research, ranging from screening for cystic fibrosis and sickle cell anemia to environmental monitoring.

The laboratory in this matter, FSA, uses the PCR method to look at one particular gene, the DQ alpha gene; it is a protein present on lymphocytes and other white blood cells and is part of the immune system. The DQ alpha gene represents only one gene out of thousands contained in the chromosomes of DNA.

The DQ alpha gene is genetically polymorphic,

which means that it is both genetically inherited and appears in alternative forms in different people. The alternative forms of the gene are called alleles or traits.

There are six readily detectable alleles or traits in the DQ alpha system. These different alleles have been given numbers to identify them. These are 1.1, 1.2, 1.3, 2, 3, and 4. Every individual has two alleles, one inherited from each parent. These two alleles may either be both the same (homozygous, e.g., 1, 1) or different (heterozygous, e.g., 1, 4). The six combinations result in twenty-one possible "genotypes," each of which appears in varying proportions within the population. Each person is classified into one of the twenty-one possible genotypes. PCR analysis looks for matches for these combinations.

Testing of Linda VanderVeen's blood indicated that her DQ alpha genotype was 1.3, 4. Testing of the hair root found on the snow brush indicated also 1.3, 4. It therefore could have come from the victim. It could not have been defendant's hair because his DQ alpha genotype was 3, 4.

Using previously conducted studies, scientists are able to determine how often each of the different genotypes appears in different populations, generally defined by race. Dr. Blake explained that the statistics on how frequently each of the genotypes occurs in a population are compiled by the company that distributes the test used in this matter, Cetus Corporation, and that some scientists keep their own statistics. Dr. Blake kept his own statistics over several years from his laboratory work. On the basis of his research, Dr. Blake believed that the 1.3, 4 allele type appears in the Caucasian population at a rate of about 4.3 percent. The 1.3, 4 allele type appears in about 8 percent of the Black population.

B

The PCR method is, simply put, a procedure to replicate repeatedly part of the DNA of a cell so that millions of copies of a particular gene are eventually produced in order to analyze the DNA.

The steps used in the PCR process involve some of the same steps used in the RFLP method. First, the DNA must be purified. This means that the cell containing the DNA must be broken with an enzyme and a soap. It is simply a way to isolate the DNA from foreign elements.

The second step is for the isolated DNA to be amplified; this is where the PCR method is distinctive. No more than fifty percent of the specimen being tested is added to a special mixture containing the chemicals that amplify the isolated DNA. This includes an enzyme found in hot springs (Taq polymerase), buffer salts, and primers, which are small pieces of DNA that recognize the four bases, A, T, G and C. It is Taq polymerase specifically that copies the targeted gene.

The DNA in the PCR mixture is then denatured. This is done by heating and cooling a tube containing the mixture in cycles with a device called a thermal cycler. This process is automated with the use of a heating block. The cycle is typically repeated thirty or thirty-two times, but FSA repeated it thirty-five times in this case. The greater the number of cycles performed, the larger the amount of DNA is produced. Each cycle doubles the amount of DNA being tested.

During a cycle, the primer targets the specific gene and will only bind to the genetically complementary portion of the DNA. At a different temperature, the enzyme works to build-up or copy the targeted gene. At the end of the thirty-five cycles, there are approximately sixteen billion copies of

the strand of DNA that incorporates the targeted gene.

The third step is for the DNA to be placed onto a nitrocellulose filter to view what has been amplified. The allele-specific DNA being searched for is already on the filter. Only the DNA from the sample that is compatible with the gene being searched for will adhere to the filter. By washing the DNA strip with an enzyme, the filter should turn blue if the DNA has bound to it. A blue dot is a match; a blank is a non-match. The amplified DNA may then be typed for the various DQ alpha genotypes. This process is referred to as the reverse-dot blot procedure or the blue-dot procedure.

C

The company that holds the patent on the PCR method, Cetus Corporation, has developed and marketed commercial kits with procedural manuals for use in forensic laboratories. The reverse dot-blot method, used by FSA to type the alleles, is generally accepted in the scientific community as reliable, according to the prosecution's experts. This was not contested by the defendant's expert witness.

Because of the advantages of the PCR method over other DNA testing methods, its impact has been enormous on a wide range of scientific disciplines. The great advantage of the PCR method compared to the RFLP method is that it is much quicker and may be used on much smaller samples of DNA, such as hair samples. It can be used on nearly microscopic specks of tissue containing as few as twenty to one hundred white blood cells rather than the five thousand to fifty thousand cells normally required by RFLP analysis. It also may be used more easily on samples of DNA that

have degraded as a result of high temperatures or humidity. The results of PCR testing are also easier to interpret than the results of RFLP analysis.

A disadvantage of the PCR method, when compared to the RFLP method, is that only one probe or locus is analyzed. In contrast, there generally are at least four probes or loci that are viewed with the RFLP method. The possibility of distinguishing individuals is much lower with the PCR method than with the RFLP method. PCR analysis detects variations in actual genes that tend to vary much less from one person to the next than the DNA strands that are the subject of analysis in the RFLP method. As a result, each profile tends to be less unique as produced by the PCR than by the RFLP method. For example, in RFLP results, the typical statistical probabilities of a DNA match may range from one in two million to one in sixty-one million. In contrast, in the case at bar, the victim's DQ alpha genotype was consistent with about five percent of the Caucasian population or one in twenty people. In other cases, however, the genotype might be considerably more rare and thus more conclusive of a match. While the PCR method is conclusive in excluding persons or suspects, its use in an analogous manner to the RFLP method in affirmatively identifying suspects must proceed with considerable caution, with the fact-finder being carefully apprised of its inherent limitations.

According to Dr. Ginsburg, an associate professor of internal medicine and human genetics at the University of Michigan School of Medicine, the PCR method is generally accepted in the scientific community as reliable. Dr. Ginsburg testified that he used it in his work and that all modern molecular biology laboratories use the method routinely. In fact, Dr. Ginsburg believed that the PCR method

is so reliable that it is routinely used in making life and death medical decisions.

Dr. Coussens, an assistant professor of microbiology, public health, and animal science at Michigan State University, also believed that the PCR method is generally accepted in the scientific community as reliable on the basis of the scientific literature and his personal experience. Dr. Coussens has participated in workshops with the Michigan State Police and has worked with evidentiary samples using the PCR method.

Dr. Blake, the forensic serologist, had used the PCR method for four years. According to Dr. Blake, the PCR method has evolved significantly, even since 1988. In his judgment, the possibility of human error has been virtually eliminated. Dr. Blake observed, however, that the only perfect check on the PCR method is for another analyst to be able to reproduce the results. For this reason, Dr. Blake only uses one-half of the sample for testing.

Dr. Blomberg is an associate professor of immunology and genetics at the University of Miami School of Medicine. Dr. Blomberg also had not performed any forensic analysis herself. However, she testified that the PCR method was appropriate for forensic use.

None of the prosecution's independent witnesses had used the PCR method for forensic testing. Dr. Ginsburg was not aware of any literature, other than from employees or former employees of commercial laboratories, regarding the use of the PCR method in the forensic setting.

Because Dr. Coussens worked in the area of DNA testing with animals, many of the samples he worked with were not in pristine condition, similar to forensic samples. The samples he tested often came from slaughterhouses. However, in his judg-

ment, contaminants rarely caused a problem once the DNA was reextracted and repurified.

The fact that the prosecution's experts did not have forensic experience in the use of the PCR method does not mean that the standard for the acceptance of the scientific technique was not met. Rather it speaks more to the fact that the PCR method of DNA analysis is a relatively new procedure. The prosecution's experts were in agreement that the PCR method is accepted as reliable in the scientific community, including for forensic use.

In *Young, supra* at 485, the Supreme Court did not require that only forensic scientists may establish the reliability of a novel scientific procedure where the community of forensic scientists was relatively small and a consensus of such community could not be reached in any meaningful sense. Instead, the experts should only be required to possess sufficient theoretical understanding and practical experience to be able to evaluate the evidence. *Id.* The experts, however, need to explain the gaps in their own knowledge and experience, and also reach general agreement about the reliability of the information they are using to fill these gaps, in order to testify as experts. *Id.*

The prosecution's experts had more than adequate knowledge and experience to determine if the PCR method could be employed in the forensic setting. Their major concerns were laboratory protocol and preventing contamination. These were thoroughly addressed by the prosecution's experts, as will be discussed below. They were able to address these problems on the basis of their own experience and knowledge. Consequently, the lack of forensic experience did not undermine their testimony.

Defendant's expert, Dr. Bhagwat, was an assistant professor in molecular biology at Wayne State

University. Dr. Bhagwat also had no prior experience with the forensic use of PCR testing. While Dr. Bhagwat admitted that there was no real dispute that PCR testing was acceptable for academic work or laboratory research, he believed that there were problems with PCR testing for forensic purposes. First, there was possible on-scene contamination or contamination in the laboratory. Second, according to Dr. Bhagwat, there was a controversy in the scientific community over PCR testing in the forensic setting largely due to the errors caused by the enzyme Taq polymerase.

D

Few jurisdictions have addressed the reliability of the PCR method under the *Frye* test. In *State v Russell,* 125 Wash 2d 24, 54; 882 P2d 747 (1994), the Washington Supreme Court addressed the admissibility of the results of the PCR method under the *Frye* rule. Dr. Blake also performed the test in *Russell.* More recently, the same court followed *Russell* in *State v Gentry,* 125 Wash 2d 570, 586-587; 888 P2d 1105 (1995). The court in *Gentry* held that Dr. Blake's actual procedures in performing the test are relevant to the weight of the evidence, not to its admissibility. *Gentry, supra* at 588-589.

The Superior Court of New Jersey in *State v Williams,* 252 NJ Super 369; 599 A2d 960 (1991), also held that PCR results were admissible under a version of the *Frye* test. Again, Dr. Blake performed the test at issue in that case. Other states have admitted PCR test results, but under tests other than the *Frye* test.[19]

The consensus among the other jurisdictions is

---

[19] See *State v Moore,* 268 Mont 20, 41-42; 885 P2d 457 (1994) (PCR analysis is sufficiently reliable for forensic purposes); *State v Lyons,* 124 Or App 598, 602-610; 863 P2d 1303 (1993), review gtd 319 Or 406; 879 P2d 1284 (1994) (PCR test results from FSA ruled admissible under

that PCR test results are admissible because the method is a reliable one. The potential problems of contamination and errors caused by Taq polymerase have not been judged serious enough to undermine the reliability of the PCR method.

A new controversy that has developed over the reliability of the PCR method is predicated upon a report prepared by the National Research Council (NRC) of the National Academy of Sciences in 1992: DNA *Technology in Forensic Science.* The report did not exist at the time of the hearings in this case.

Although the report was not admitted in the trial court, we have reviewed it for the first time on appeal as have courts in other jurisdictions. In *State v Bible,* 175 Ariz 549, 586, n 33; 858 P2d 1152 (1993), cert den — US —; 114 S Ct 1578; 128 L Ed 2d 221 (1994), the Arizona Supreme Court held that it would consider scientific literature published in between the time of the trial and appellate review. The court reasoned that technology is constantly evolving and there was no valid reason for the court to limit its decision to what was known at the time of trial. We also believe that it is appropriate to take notice of new scientific literature under the same rationale: in order to ensure that our decisions are fashioned on the basis of the most up-to-date scientific and technical information available, as well as to promote judicial economy. See also *State v Anderson,* 118 NM

a seven-factor relevancy test, which includes determining if the technique has general acceptance in the field); *Clarke v State,* 813 SW2d 654, 655 (Tex App, 1991), aff'd 839 SW2d 92 (Tex Crim App, 1992), cert den — US —; 113 S Ct 1611; 123 L Ed 2d 172 (1993) (relevancy standard was met for the admission of PCR test results); *Spencer v Commonwealth,* 240 Va 78, 97-98; 393 SE2d 609 (1990), cert den 498 US 908 (1990) (while not applying the *Frye* test, the court held that PCR test results, performed by Dr. Blake and FSA, were sufficiently reliable to be admitted).

284; 881 P2d 29 (1994). We do not believe that the NRC's report alters the result in this case.

The NRC report endorsed the forensic use of DNA analysis while also concluding that potential problems existed with the procedure, which problems required a series of safeguards. But "as a general matter, so long as the safeguards we discuss in this report are followed, admissibility of DNA typing should be encouraged. There is no substantial dispute about the underlying scientific principles." DNA Technology, supra at 145.

In Russell, supra at 44-49, the Washington court addressed the effect of the NRC report on the admissibility of PCR testing under the Frye standard. In an analysis of both the report and decisions from other courts that had reviewed the report, the court concluded that the NRC's report primarily called for PCR quality assurance standards in both the laboratory procedures used and the persons who may perform the test. Id. at 46-49. The report called for accreditation and governmental regulation of laboratories. Id. at 49. Because there was no precedent for the regulation of forensic testing, the court concluded that, while regulation and accreditation might be desirable, the absence of either or both of them should not bar the admissibility of PCR-produced DNA evidence. Id.

The criticisms set forth in the NRC's report have limited relevance to the immediate case. Many of the concerns that were raised were the result of early DNA cases in which contaminants were allowed into the samples because of poor laboratory procedures. See, e.g., People v Castro, 144 Misc 2d 956; 545 NYS2d 985 (1989). As discussed before, other jurisdictions have recognized that DNA testing, including PCR testing, can be reliable for forensic use if the proper procedures and other safeguards are followed. In every significant re-

spect, the procedures adopted by FSA in the instant case appear to have been in compliance with the precautionary recommendations of the NRC report. We do not find the presence or absence of a formal regulatory body to be significant one way or the other in terms of assessing the integrity of the actual safeguards adopted by the testing laboratory in this case.

E

The principal criticism of the forensic use of the PCR method raised by defendant's expert, Dr. Bhagwat, is that the enzyme, Taq polymerase, may create copying errors during the chain reaction and thereby cause false results.[20] Dr. Bhagwat testified that the test was not appropriate for forensic use because of the error rate caused by the enzyme.

Taq polymerase is used because it is a heat-insensitive bacterium. For this reason, Taq polymerase made practical the PCR method. It allowed for automation of the cycling process whereas scientists previously had to add the enzyme manually at each cycle, thereby increasing substantially the risk of human error.

Both Dr. Ginsburg and Dr. Blomberg acknowledged that Taq polymerase is somewhat prone to causing errors. They estimated the error rate at about one in 10,000. The potential error is that the enzyme may copy a base incorrectly, i.e., read an A as a G. Dr. Ginsburg considered any such error to be insignificant in light of the amplification process. Because there are so many other molecules, the error would have to reoccur in order for there

---

[20] Because of the concern over such errors, another company is attempting to market another polymerase that is even more accurate. As a result, in future cases this problem may not be an issue.

to be any effect and it is highly unlikely that the same error would be repeated. Statistically, the error would only occur once in the course of a test.

With such a low error rate, the actual chance of an error in the ultimate DNA analysis is not a problem, according to Dr. Blomberg. It is highly unlikely that any mutation caused by the Taq polymerase would affect the result in this type of a case, according to both Dr. Ginsburg and Dr. Blomberg. Nor did Dr. Blomberg have problems with the error rate in her own work. In this type of testing, the error rate was not viewed as a fundamental problem.

Dr. Blake also did not believe that the error rate for Taq polymerase was significant because of the number of copies made. In order for an error to be significant, it would have to occur during the first cycle or occur at a certain place within the 242-base pair sequence. Dr. Blake found it hard to conceive of a situation where a false positive result would obtain because of an error caused by Taq polymerase.

Dr. Bhagwat believed the error rate was actually higher on the basis of studies that had been conducted and because the number of molecules was multiplied. However, he admitted that in order for the results to be affected, the error would have to occur at a certain point in a cycle and the odds were one in 2,410,000 of this occurring. Nonetheless, Dr. Bhagwat maintained that the error rate was significant because there were unknown "hot spots" that could cause mutation and errors would accumulate because of the number of cycles performed.

Dr. Bhagwat thought that multiple tests should be performed to ensure reliability and accuracy. Because the PCR method is used principally when there are very small amounts of material to test,

there often is insufficient material available to run multiple tests. Nonetheless, as explained previously, Dr. Blake's procedure was to use only one-half the sample for testing so there was some leftover material for additional testing.

In fact, the parties agreed in this case to run a second PCR test after the *Davis-Frye* hearing. The agreement was that if the same result came up in the second test, the second result would not be admitted at trial. However, if the test results were different, then defendant could present that evidence. Another company, Serological Research Institute, performed the second test. Dr. Blake and Brian Wraxall, who performed the second test, were instructed not to communicate the results of their tests with one another.

Wraxall also found that the victim's genotype was 1.3, 4, the same as Dr. Blake found. Defendant's genotype was also 3, 4, again the same as Dr. Blake found. The hair found on the snow brush also was the same, 1.3, 4. There also was no DNA found on the hair shaft in the second test, which indicated that the hair sample was not contaminated with another person's DNA.

Contrary to the original agreement, the jury was instructed, pursuant to a later agreement, that a second PCR test had been run and that the results were the same as the first test.

In *Russell, supra* at 52, 54, the Washington court addressed the error rate of Taq polymerase and it found it was not a reason for refusing to admit the evidence. The evidence in *Russell, supra* at 52, showed that errors are rarely caused by Taq polymerase and are generally detectable.

The evidence in this case also demonstrated that the error rate for Taq polymerase is not significant. It is highly unlikely that an error will affect the results in a given case. Although the error

rate is low, performing a second test is one way of checking to make sure that an error has not occurred because of the enzyme. That was performed in this case although we do not believe that such a test is required in order for PCR evidence to be admissible under the *Davis-Frye* standard. The absence of a second test would merely be relevant to the weight to be given to the evidence. Consequently, we do not believe that the error rate associated with Taq polymerase undermines the reliability of the PCR analysis as a forensic method.

F

Dr. Bhagwat also opined that the possibility of contamination of the DNA sample, either at the crime scene or in the laboratory, established that the PCR method was not appropriate for forensic use.

The PCR method's great advantage can also be a shortcoming. Because of its power to amplify a single cell, if a cell from another individual migrates into the specimen (such as from a laboratory employee or someone collecting the sample), the result could be affected. Environmental factors, even if they cause the DNA to degrade, do not cause false results. Nor does DNA from animals cause false results.

This potential contamination problem could produce a false positive result when there should have been no result at all. This occurs where a sample lacks DNA but is contaminated with another's DNA such as from hair or skin cells. Carry-over contamination can also occur from the DNA created during the PCR process. The odds remain extremely high, however, that a defendant would be falsely excluded rather than falsely included if

this occurred. Laboratories must be concerned with controlling or preventing carry-over contamination because human contamination would not be readily apparent where the original sample had no DNA. Laboratories therefore routinely follow rigorous procedures to avoid this risk.

Forensic laboratories, such as FSA, actually are more careful in their protocol to prevent contamination than research laboratories. A typical safeguard is to perform the work in two separate laboratories to prevent the contamination between samples and the amplified DNA. Further, control samples are used and processed at the same time, such as using a known DNA sample and a sample with no DNA in it.

In the case at bar, FSA used extensive controls in the work area to prevent contamination. The area where the PCR product was worked on was isolated from the rest of the laboratory. The different samples, including the reference and evidentiary samples, were prepared at different times to prevent cross-DNA contamination. Negative controls or blanks were also used to try to detect errors in the process.

Dr. Blake explained that FSA has numerous additional safeguards for the handling of specimens at each stage of the process. The following procedures, for instance, are routinely used by FSA in its laboratory:

   (1) plastic gloves are used and changed frequently;
   (2) tools and solutions are sterile;
   (3) there is a substantial amount of room to work so that the work area is not congested or confusing;
   (4) the preparation of the DNA is done with a laminar flow hood;

(5) reagents used are "pre-aliquoted" or exactly divided;

(6) the DNA preparation area is physically isolated from the PCR amplification and work area;

(7) hair shafts are used as a control when testing hair samples;

(8) blank mixtures (without DNA) are run through the testing procedure, including keeping those mixtures open while the targeted DNA is added to other specimens in the work area;

(9) known DNA samples are used in the testing process so that some test results are known and predictable; and

(10) control probes are used on the DQ alpha allele typing strips.

Dr. Ginsburg believed that FSA adequately addressed the problem of contamination on the basis of all available information. The possibility of contamination has been well recognized in the scientific community. For this reason, scientific literature has addressed at length what precautions need to be taken to avoid problems.

Dr. Coussens also believed that FSA followed appropriate procedures to guard against carry-over contamination. If any contamination occurred in the laboratory setting, it would be apparent to a competent analyst. Dr. Blomberg testified as well that FSA's protocol and method of operation were acceptable and that it had taken reasonable steps to prevent contamination.

On the facts of this case, the shaft of the hair sample also served as a control. The root of hair contains DNA. In contrast, the hair's shaft contains no DNA. Contamination of hair samples can be detected if there is DNA on a hair shaft. If there is DNA present on the shaft, it means that the sample came into contact with some other cell. For this reason, when testing hair samples the hair shaft is

used as a control to check for contamination. Dr. Bhagwat acknowledged that a hair shaft may serve as a control because of the lack of DNA in the shaft. No DNA was found on the hair shaft of the sample in this case.

The issue of contamination was also addressed in *Russell, supra* at 53-54. There, the Washington court held that strict adherence to sterile techniques and procedures specifically addressed to contamination were essential to assessing the reliability of the PCR test results and, therefore, the admissibility of the results. Whether proper techniques and procedures were followed in a given case was a separate inquiry from the general acceptance of the PCR method. In each case, the party offering the evidence must be prepared to establish that reasonable laboratory procedures and protocols were followed. *Id.* The court in *Russell, supra* at 50-52, held that Dr. Blake's actual procedures in performing the test were relevant to the weight of this evidence, not to its admissibility.

In *State v Moore,* 268 Mont 20, 47-48; 885 P2d 457 (1994), the Montana Supreme Court also held that the possibility of contamination did not affect the admissibility of PCR test results. There were appropriate steps that could be taken to avoid and detect potential on-scene and human contamination of the specimen. *Id.* The court concluded that the potential for contamination can occur with virtually any physical evidence collected at crime scenes and, therefore, that this problem did not undermine the admissibility of the evidence. Instead, this area is ripe for cross-examination and is properly a matter of weight for the jury to determine. *Id.* at 48. See also *State v Lyons,* 124 Or App 598, 607-608; 863 P2d 1303 (1993), review gtd 319 Or 406; 879 P2d 1284 (1994).

The evidence at the *Davis-Frye* hearing in the

case at bar established that there are adequate controls and procedures to guard against contamination in the PCR process, which, if followed, will produce reliable and accurate test results. Accordingly, as long as adequate safeguards are undertaken to prevent contamination in the laboratory, results from PCR testing are reliable. Potential problems are generally identifiable and subject to prevention through the proper procedures. It is a separate inquiry whether the proper procedures were followed in a given case. *Gentry, supra* at 588-589.

Defendant has not shown that the potential for contamination makes the PCR method unreliable. Again, if proper laboratory procedures are followed to prevent contamination, then the PCR method appears to produce accurate results. Whether the proper procedures and safeguards are followed in a particular case is a matter for the jury to consider in determining how much weight it should give the results. However, where there are serious errors in a particular laboratory's work, a court may rule the test results themselves to be inadmissible. *Russell, supra* at 54.

G

Defendant also argues that the PCR method has not been subjected to validation through independently conducted studies. Validation through the publication of independently conducted studies is only required when members of the relevant scientific community disagree on the reliability of a novel scientific technique. *People v Stoughton,* 185 Mich App 219, 229; 460 NW2d 591 (1990).

The existence of validation studies for the PCR method was not established in the trial court. This may be due to the fact that in 1990 there still was

not a great amount of published information about the forensic use of the PCR method.

Since the time of the hearing in this case, it appears that many more reports and studies have been produced concerning the validity of the PCR method. As stated earlier, it is appropriate in the context of scientific and technical evidence to take notice of the most up-to-date research available, including research which may have been undertaken after the time of a trial. In *Russell, supra* at 49-50, the court determined that there had been extensive validation studies performed concerning PCR testing, citing in particular Comey & Budowle, *Validation Studies on the Analysis of the HLA DQ Alpha Locus Using the Polymerase Chain Reaction,* 36 J Forensic Sci 1633 (1991). The *Russell* court also noted that Cetus Corporation had produced a bibliography listing over one thousand articles on PCR analysis. *Russell, supra* at 49. Defendant has not argued that any current research has called into question the reliability of the PCR method other than by citing the NRC's report. Because we believe that the *Davis-Frye* hearings in this case established that there was agreement in the scientific community concerning the acceptance of the PCR method for forensic use, the lack of validation studies at the time does not justify reversing the trial court's decision. We are aware of no more recent independent validation studies that have called into question the reliability of the PCR method.

The prosecution met its burden under the *Davis-Frye* test in establishing that the PCR method is generally accepted as reliable in the scientific community. The trial court's findings regarding this issue were not clearly erroneous. *Adams, supra* at 269. Therefore, we hold that trial courts in Michigan may take judicial notice of the reliability

of DNA testing using the PCR method.[21] However, before a court admits the test results into evidence in a given case, the prosecutor must still show that generally accepted laboratory procedures were followed. *Adams, supra* at 277. The testimony of experts may then be considered by the jury in determining the weight that it should give to the evidence. FSA's procedures in this case were consistent with generally accepted procedures for PCR testing and were reasonably designed to minimize any risk of error in the procedures.

If there are concerns regarding the weight that juries will give PCR test results, those concerns are overstated. As long as it is made clear to juries that this type of testing contains inherent limitations and care is taken to avoid confusing the PCR and RFLP methods, the evidence should not be misinterpreted. Where the prosecution attempts to use PCR evidence along the same lines as RFLP evidence—to identify rather than to exclude an individual—then greater care must be undertaken to explain to the jury its probative limitations.

Linda VanderVeen was kidnapped and murdered on February 12, 1979. The defendant came under suspicion on February 23, was arrested on March 30, and was convicted on November 9. This was sixteen years ago. It is long overdue that this case be brought to a conclusion and that justice be obtained for the victim, her family and friends, her community, and the defendant.

Affirmed.

---

[21] However, we have not been asked to decide if the statistical method used by FSA to compute the frequencies for the twenty-one genotypes appearing in various racial and ethnic populations also meets the *Davis-Frye* standard.