*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

KENNY WAYNE MCBRIDE,

Defendant-Appellant.

UNPUBLISHED
April 20, 2023

No. 360446
Monroe Circuit Court
LC No. 2020-245852-FC

Before: GARRETT, P.J., and K. F. KELLY and HOOD, JJ.

PER CURIAM.

Defendant appeals by delayed leave granted[1] his jury-trial convictions of first-degree premeditated murder and disinterment, mutilation, defacement, removal, or carrying away of a human body, for which he was sentenced as a fourth-offense habitual offender to life imprisonment without the possibility of parole and 114 to 480 months' imprisonment, respectively. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Defendant, Kenny Wayne McBride, lived with his father, Kenneth Reece, and the victim, who was Kenneth's mother-in-law, Cecelia Gibson. There was some testimony the victim thought of defendant as a bad roommate, but no one believed there were serious issues between them. On the day of the murder, the victim's son, Billy Jo Gibson, was at the defendant's home with the victim and defendant. A verbal altercation occurred between the victim and defendant over bottled water, which caused Billy to become concerned about the victim's safety. Despite Billy's concern, the victim insisted she was safe to stay home with defendant.

While defendant and the victim were home alone from 2:00 p.m. on February 16, 2020, until 3:00 a.m. on February 17, 2020, the victim was beaten to death with the perpetrator's fists, a

---

[1] *People v McBride*, unpublished order of the Court of Appeals, entered July 13, 2022 (Docket No. 360446).

piggy bank, and a protective gate for children. Once dead, the victim's head was removed with the serrated blades of two bread knives. When Kenneth arrived home from work and found the victim's body, defendant was in his room on the second floor with the door closed but not latched. When Kenneth called for defendant, he quickly came downstairs. Kenneth testified defendant acted strangely because he did not appear shocked to find a dead body in the living room but instead was concerned about how Kenneth would react. Kenneth called 911 and reported the body.

Police arrived shortly thereafter and restrained defendant. Police found the victim's severed head in the driveway. Defendant had injuries on his hands, arms, and head, which were consistent with someone who struggled to kill and behead someone. A pair of blue jeans, in which defendant's DNA was found in the waistband, were also found in the bathroom, covered in what appeared to be the blood and flesh of the victim. On the edge of the bathtub, police found defendant's palm print in the victim's blood. Under the victim's body, police found shredded photographs of defendant's family. Defendant was charged with open murder and mutilation of a dead body.

After the crime was discovered, local news media covered the case. Before trial commenced, defendant moved the trial court to change venue, claiming he could not receive a fair trial because of the pretrial publicity. The trial court disagreed, noting defendant had not presented proof of such pervasive coverage allowing for a presumption all potential jurors were irredeemably prejudiced. The trial court stated any potential exposure to the media coverage could be dealt with at jury selection. After four days of trial, defendant was convicted and sentenced as noted. This appeal followed.

## II. JURY SELECTION

Defendant first argues he is entitled to reversal of his convictions because a biased juror was not excused by the trial court for cause.[2] We disagree.

---

[2] Defendant also makes certain statements in his brief in which he implies he is asserting a claim of ineffective assistance of counsel, stating defense counsel should have requested additional peremptory challenges under MCR 6.412(E)(2). Defendant has abandoned this claim by failing to brief it and including it in his statement of questions presented. *People v Bass*, 317 Mich App 241, 276; 893 NW2d 140 (2016). Defendant does not cite any caselaw regarding ineffective assistance of counsel, does not analyze any of the elements of such a claim, and never explicitly states his defense counsel's assistance was constitutionally defective in some manner. Defendant is not permitted "to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Bass*, 317 Mich App at 276 (quotation marks and citation omitted). "The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow." *Id*. (quotation marks and citation omitted). Thus, defendant has abandoned this issue on appeal. *Id*.

But even if not abandoned, the argument would lack merit. As we explain below, defendant has failed to demonstrate that there was any juror bias; therefore, defendant is unable to show any

A. PRESERVATION AND STANDARD OF REVIEW

The decision to grant or deny a challenge for cause is reviewed for abuse of discretion. *People v Eccles*, 260 Mich App 379, 382-383; 677 NW2d 76 (2004). "An abuse of discretion occurs when the trial court's decision falls outside the range of principled outcomes." *People v Korkigian*, 334 Mich App 481, 489; 965 NW2d 222 (2020) (quotation marks and citation omitted). However, "once a party shows that a prospective juror falls within the parameters of one of the grounds enumerated in MCR 2.511(D), the trial court is without discretion to retain that juror, who must be excused for cause." *Eccles*, 260 Mich App at 383. Generally, "[w]hether defendant was denied his [constitutional] right to an impartial jury . . . is a constitutional question that we review de novo." *People v Bryant*, 491 Mich 575, 595; 822 NW2d 124 (2012).

"The general rule is that the defendant must exhaust his peremptory challenges to preserve a jury selection question." *People v Jendrzejewski*, 455 Mich 495, 514 n 19; 566 NW2d 530 (1997). Alternatively, "when a party refuses to express satisfaction with the jury empaneled, the issue is preserved for appeal." *Id*. (quotation marks and citation omitted). More generally, though, "[a] defendant must raise an issue in the trial court to preserve it for our review." *People v Heft*, 299 Mich App 69, 78; 829 NW2d 266 (2012). Here, although defendant was out of peremptory challenges, he never challenged the juror for cause in any manner. As a result, the issue of the juror's potential bias was never raised in the trial court and is not preserved for this Court's review. *Id*.

Because this issue is unpreserved, we review the "unpreserved claim for plain error affecting defendant's substantial rights." *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Bailey*, 330 Mich App 41, 53-54; 944 NW2d 370 (2019) (quotation marks and citation omitted). To show that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. (quotation marks and citation omitted). "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (quotation marks and citation omitted).

B. ANALYSIS

Defendant contends his constitutional right to a fair and impartial jury was violated by a biased juror being among those individuals who decided defendant's guilt. Specifically, defendant

---

prejudice from his attorney's decision to not seek additional preemptory challenges. See *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008) ("To succeed on a claim of ineffective assistance of counsel, the defendant must show that, but for an error by counsel, the result of the proceedings would have been different, and that the proceedings were fundamentally unfair or unreliable.").

argues that the selection of a juror who had been a court deputy in a different county deprived him of his constitutional right to an unbiased jury.

" 'The right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial "indifferent" jurors.' " *Jendrzejewski*, 455 Mich at 501, quoting *Irvin v Dowd*, 366 US 717, 722; 81 S Ct 1639; 6 L Ed 2d 751 (1961). "[J]urors are presumed to be . . . impartial, until the contrary is shown." *People v Miller*, 482 Mich 540, 546; 759 NW2d 850 (2008) (quotation marks and citation omitted; alteration in original). Even so, "[a] trial court ensures that a jury is impartial by conducting voir dire and removing biased jurors before impaneling the jury . . . ." *People v Haynes*, 338 Mich App 392, 411; 980 NW2d 66 (2021). "The burden is on the defendant to establish that the juror was not impartial or at least that the juror's impartiality is in reasonable doubt." *Miller*, 482 Mich at 550. "MCR 6.412(D)(2) provides that if 'the court finds that a ground for challenging a juror for cause is present, the court on its own initiative should, or on motion of either party must, excuse the juror from the panel.' " *Miller*, 482 Mich at 546. One such ground, under MCR 2.511(D)(2) is when the person "is biased for or against a party or attorney[.]"

Here, defendant contends the challenged juror was biased in favor of the prosecution and police because the juror stated he worked for a court in a different county. The trial court asked the juror if this would cause him to have a bias in favor of the prosecution and the police. The juror initially stated he did not "think" so. The trial court then asked: "You don't think so?" The juror's response to the question was nonverbal—the transcript simply states "(No verbal response)." Defendant uses this ambiguity in the record in his favor, claiming the transcript is unclear regarding whether the juror clarified his ability to decide the case without a bias in favor of the prosecution and police. However, from simple context clues in the record, it is clear the juror's answer indicated that he would not have bias. Immediately after the nonverbal answer, the trial court asked: "So, you'd be able to hear all of the testimony and decide—and the exhibits— and decide whether or not the prosecutor has proved her case?" The juror responded, "Yes, Judge." This question from the trial court and the juror's response clearly indicates the juror's nonverbal response to the previous question permitted an inference that the juror would not operate with a bias.

Moreover, even given the apparent ambiguity in the juror's nonverbal response, the juror later clearly and expressly stated he understood the prosecution had the burden to prove its case and defendant did not have to prove anything. If the juror had a bias in favor of the prosecution, his answers to questions about the prosecutor's burden and defendant's responsibility to prove something would presumably have been different. Additionally, upon further questioning by defense counsel, the juror said he had not heard anything about the case in the media and did not have any friends or family who worked in law enforcement. In short, after the brief misstatement by the juror—that he did not "think" he would be biased in favor of the prosecution and police— he made it abundantly clear he would respect the burden of proof being placed with the prosecutor. Thus, the record does not support that the challenged juror exhibited bias under MCR 2.511(D)(2) and, as a result, the juror was not required to be removed for cause from the jury under MCR 6.412(D)(2). See *Miller*, 482 Mich at 546.

In *People v Lee*, 212 Mich App 228, 249; 537 NW2d 233 (1995), this Court considered a similar claim that the trial court erred by denying defendant's for-cause challenge to a prospective juror who "express[ed] some concern about her ability to keep in mind that defendant was

presumed innocent." In affirming the trial court's decision not to excuse the prospective juror for cause, this Court stated:

> Despite some concerns that it might be difficult for her to do so, [the prospective juror] assured the court that she could be fair, would follow the court's instructions, and would decide the case exclusively on the basis of the evidence.
>
> We find no error with the trial court's decision not to excuse [the prospective juror] for cause. [The prospective juror] did not indicate that she had a state of mind that would prevent her from rendering a just verdict. Nor did she possess opinions that would have improperly influenced the verdict. Rather, she stated—apparently credibly to the trial court—that she would decide the case consistent with the requirements of the law. The court therefore was not required to dismiss her for cause. [*Id.* (citations omitted).]

A similar analysis applies here. The juror in question made an arguably questionable comment regarding whether he would have bias in favor of the prosecution and police when he stated he did not "think" he would be biased in favor of the prosecution. To begin, the juror made the statement in the negative—he did *not think* he would have bias. Moreover, like the potential juror in *Lee*, 212 Mich App at 249, the challenged juror in this case subsequently assured the trial court he understood the burdens of proof and would follow them. Any lingering concerns about the original answer provided by the juror were thereby resolved. See *id.*

Considering defendant has not satisfied his burden of showing juror bias, he has failed to present a convincing claim that his right to a fair and impartial jury was violated. In other words, there was no error, plain or otherwise, caused by the challenged juror remaining on the jury, and we affirm. See *Miller*, 482 Mich at 550; *Carines*, 460 Mich at 763.

## III. CHANGE OF VENUE

Next, defendant argues the trial court abused its discretion when it denied his motion to change venue in light of the pretrial publicity. We disagree.

### A. STANDARD OF REVIEW

"A motion for change of venue is addressed to the discretion of the trial judge." *Jendrzejewski*, 455 Mich at 500. Because "[t]he court's action in ordering such a change or refusing it is discretionary, [it is] not to be disturbed on review, unless there clearly appears a palpable abuse of discretion." *Id.* (quotation marks and citation omitted). "An abuse of discretion occurs when the trial court's decision falls outside the range of principled outcomes." *Korkigian*, 334 Mich App at 489 (quotation marks and citation omitted).

### B. ANALYSIS

Defendant contends the trial court should have granted his motion to change venue because pretrial publicity about the case made it impossible for him to have a fair trial in Monroe County. According to defendant, the pretrial publicity included statements about defendant's prior criminal history and caused defendant to be hated within the county.

"The general venue rule is that defendants should be tried in the county where the crime was committed." *People v Boshell*, 337 Mich App 322, 339; 975 NW2d 72 (2021) (quotation marks and citation omitted). "An exception to the rule provides that the court may, in special circumstances where justice demands or statute provides, change venue to another county." *People v Unger*, 278 Mich App 210, 254; 749 NW2d 272 (2008) (quotation marks and citation omitted). As this Court has explained, "it may be appropriate to change the venue of a criminal trial when widespread media coverage and community interest have led to actual prejudice against the defendant." *Id.* "However, the existence of pretrial publicity, standing alone, does not necessitate a change of venue." *People v Cline*, 276 Mich App 634, 639; 741 NW2d 563 (2007) (quotation marks, citation, and alterations omitted). Instead, the appropriate inquiry is whether there "was such unrelenting prejudicial pretrial publicity [that] the entire community will be presumed both exposed to the publicity and prejudiced by it, entitling the defendant to a change of venue." *Jendrzejewski*, 455 Mich at 501 (quotation marks and citation omitted; alteration in original).

"Community prejudice amounting to actual bias has been found where there was extensive highly inflammatory pretrial publicity that saturated the community to such an extent that the entire jury pool was tainted, and, much more infrequently, community bias has been implied from a high percentage of the venire who admit to a disqualifying prejudice." *Unger*, 278 Mich App at 254 (quotation marks and citation omitted). Moreover, the type and character of the coverage matters when conducting the inquiry. *Jendrzejewski*, 455 Mich at 504. "As the Supreme Court observed in [*Murphy v Florida*, 421 US 794, 800 n 4; 95 S Ct 2031; 44 L Ed 2d 589 (1975)], 'we . . . distinguish between . . . largely factual publicity from that which is invidious or inflammatory.' " *Jendrzejewski*, 455 Mich at 504.

During the lower court proceedings, defendant provided the trial court with five written articles from local news sources. The accounts given in the articles were almost entirely factual. Relevantly, the articles stated defendant had been arrested for the murder and beheading of the victim. Considering defendant was denied bond, some of the articles also mentioned defendant's past failure to appear in court when required. Further, the articles, in varying degrees of specificity, discussed defendant's history of violent and nonviolent crimes. None of the articles contained inflammatory opinions related to defendant as a person. Nor did the articles contain opinions regarding whether he was guilty of the crimes charged. Notably, one article was undated, but only mentioned issues related to defendant's arraignment; three of the articles were from February 19, 2020, which was two days after defendant was arrested; and the final article was from March 5, 2020, which was about 15 months before jury selection began.

During the pendency of this appeal, defendant moved for, and was granted, leave to supplement the record with five additional articles, all from the online version of the Monroe News.[3] These newly-provided articles do not change our conclusion. Although the articles are more recent with respect to when the trial occurred, they still are factual in nature and contain no inflammatory or prejudicial opinions regarding defendant's guilt or about defendant generally. In

---

[3] *People v McBride*, unpublished order of the Court of Appeals, entered August 23, 2020 (Docket No. 360446).

one article from the Monroe News, published on March 5, 2020, the article began by noting defendant would undergo a competency evaluation before court proceedings would continue. The article referenced defendant's "long criminal history dating back more than 20 years," and discussed the purpose of a competency evaluation in criminal proceedings. The article stated that defendant was only charged with the crime, not guilty of it, using terms like "[a]uthorities allege," and Kenneth "reportedly discovered a bloody scene" when he arrived home. After discussing the victim's life and quoting her obituary, the article noted defendant's request for bond was denied because of his criminal history and repeated past failures to appear in court.

The second article provided by defendant was released on the Monroe News website on July 23, 2020, after the first day of the preliminary examination. This article added some facts about the victim's murder, stating the victim was believed to have been struck nearly 20 times before she died. The article once again spoke about the crime and charges in a general and factual sense. Indeed, much of the article was formed using quotations from Kenneth's testimony and his 911 call, a recording of which had been played at the preliminary examination. The article did not contain any opinions, inflammatory or otherwise, regarding defendant or his culpability in the crimes charged. Instead, the article noted only that he had been charged and accused of the crime. Once again, the article mentioned defendant's lengthy criminal history.

The third article is an identical copy of the second article, merely with a slightly different headline. Considering it is the same article, it contained the same factual information just discussed. The fourth article, published in the Monroe News on January 2, 2021, described the crime as "one of [Monroe County's] most gruesome murders," but still used specific words to clearly establish the claims against defendant were merely that—claims. Pertinently, the article stated defendant was "believed" to have committed the crime, was "facing charges" of murder and mutilation of a dead body, and "reportedly" struck the victim about 20 times before beheading her. Some facts regarding the crime scene were added, including that shredded family photographs were found surrounding the victim's corpse in the living room and that the victim's head was found outside next to a vehicle. Once again, the article did not contain any inflammatory opinions about defendant or his involvement in the crime—it reported only what was alleged in court.

The fifth and final article from the Monroe News was published on June 7, 2021, which was the first day of trial. According to the article, jury selection was set to begin in the case where the prosecution alleged defendant killed and beheaded the victim. Other than the facts already mentioned, the article stated defendant had fresh abrasions on his hands when he was arrested, and the authorities claimed "family strife" was defendant's motive for committing the crime. As before, the article was entirely factual, spoke only of allegations, and did not contain inflammatory opinions regarding defendant.

After considering all of the newly-provided articles, the factual record presented to us is that there were 10 articles written in local news media regarding the case. All of the articles were factual in nature; there were no opinion articles submitted. None of the articles proclaimed defendant's guilt or described him in an overtly inflammatory manner. While there was a discussion about the brutality of the crime committed and the gruesome nature of the crime scene, defendant has not provided any explanation for why such facts, to which any juror would inevitably be exposed during trial, were somehow too prejudicial to allow the trial to occur in Monroe County. Simply put, 10 fact-based articles published over the span of more than 15 months is not the type

of pretrial media coverage we have identified in our previous opinions that cause constitutional concern.

At most, defendant has demonstrated the possibility that potential jurors were "expos[ed] to information about [his] previous convictions or newspaper accounts of the crime for which he has been charged . . . ." *Jendrzejewski*, 455 Mich at 502. Our Supreme Court held such evidence "does not in itself establish a presumption that a defendant has been deprived of a fair trial by virtue of pretrial publicity." *Id*.

In *Cline*, this Court considered a case where the pretrial publicity consisted of "11 articles about [the defendant's] case published in local newspapers." *Cline*, 276 Mich App at 639-640. Six of those articles were about the facts of the case and the prosecution's "perceptions of the facts and evidence," and the "procedural status of the case." *Id*. Five of the articles were about antitorture legislation that had been proposed because of the facts of the defendant's case. *Id*. at 640. Only one of the articles was an opinion piece, and it was related to the proposed legislation, not the defendant's guilt. *Id*. On that record, this Court determined the pretrial publicity was not sufficiently prejudicial such that the trial court's decision to deny the motion for change of venue was an abuse of discretion. *Id*. at 641.

Considering there were fewer articles in the present case, no opinion pieces, and no potential changes in legislation as a result of the crime, the pretrial publicity in the present case is, by comparison, less egregious than in *Cline*. Accordingly, we affirm the trial court's order denying defendant's motion for change of venue.

## IV. SUFFICIENCY OF THE EVIDENCE

Defendant also argues there was insufficient evidence to sustain his first-degree premeditated murder conviction. Again, we disagree.

## A. STANDARD OF REVIEW

"We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Henry*, 315 Mich App 130, 135; 889 NW2d 1 (2016) (quotation marks and citation omitted). "To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, we review the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013) (quotation marks and citation omitted). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015) (quotation marks and citation omitted).

## B. ANALYSIS

## 1. IDENTITY

Defendant first contends there was insufficient evidence of his identity as the perpetrator of the murder to convict him beyond a reasonable doubt. According to defendant. the prosecutor only introduced circumstantial evidence of the victim's gruesome and bloody death and, in doing

so, failed to prove defendant committed the crime. Defendant argues that his fingerprints were not on any of the murder weapons, his palmprint on the bathtub occurred when defendant placed his hand on the tub after Kenneth discovered the body, the DNA expert was unable to say for certain whether the jeans belonged to defendant, and there was no solid proof the stains on the front of the jeans was comprised of blood.

There is sufficient evidence for a guilty verdict where "a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010). "The prosecution need not negate every reasonable theory of innocence; instead, it need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant." *People v Mikulen*, 324 Mich App 14, 20; 919 NW2d 454 (2018). "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016). In a challenge to the sufficiency of the evidence, any and all conflicts that arise in the evidence must be resolved in favor of the prosecutor. *Mikulen*, 324 Mich App at 20. "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

Defendant only challenges his conviction of first-degree premeditated murder in this appeal. "In pertinent part, to secure a conviction of first-degree premeditated murder, the prosecution must establish beyond a reasonable doubt a '[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing.' " *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018) (alteration in original), quoting MCL 750.316(1)(a). "The elements of premeditated murder are (1) an intentional killing of a human being (2) with premeditation and deliberation." *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009). As defined by the Michigan Supreme Court, "to premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *Oros*, 502 Mich at 240 (quotation marks, citation, and alteration omitted). Lastly, "[i]dentity of the perpetrator is an element in every criminal case." *People v Galloway*, 335 Mich App 629, 641; 967 NW2d 908 (2020).

We reject defendant's argument that there was insufficient evidence of identity to sustain defendant's conviction of first-degree premeditated murder. Defendant, the victim, and Kenneth lived together in a two-story house in Bedford Township. On the day of the murder, defendant and the victim had a brief verbal altercation. Although the issue was about bottles of water, Billy testified defendant's behavior during the argument caused him to be concerned about the victim's safety. Even so, the victim decided to stay home alone with defendant. From that point forward, the only person known to have seen the victim alive was defendant.

The evidence showed the victim was beaten to death with multiple instruments—a baby gate, a ceramic piggy bank, and the perpetrator's fists. After she died, her head was removed with a serrated blade. Photographs of the crime scene depicted two bread knives with serrated blades near the victim's corpse. According to Kenneth, those particular knives were in a drawer in the kitchen and not in the knife block on top of the kitchen counter. When police arrived on the scene, the kitchen did not appear to have been ransacked, suggesting that the person who killed and decapitated the victim knew where to find the serrated bread knives. It would be reasonable for

the jury to infer, therefore, that a killer who did not live in the home or who was not familiar with the kitchen would have used the knives in the knife block on the counter or would have had to open several drawers in search of the desired knives. This evidence permitted an inference defendant, the only person who was known to be with the victim and who knew the contents of the drawers in the house, killed the victim.

Moreover, defendant's palm print was found on the bathtub in the victim's blood. A latent print expert testified this must have occurred either by defendant having blood on his hand and then placing it on the bathtub or by defendant placing his hand in blood already deposited on the bathtub. Defendant testified it must have been the latter because he went inside the bathroom to vomit and wash out his mouth after Kenneth discovered the victim's body. Kenneth, however, testified defendant did not go in the bathroom after he returned home from work. Officers who first reported to the scene also stated defendant did not have an opportunity to go into the bathroom once they arrived. Thus, the evidence, viewed in a light most favorable to the prosecution, showed defendant had the victim's blood on his hand when he placed his hand on the edge of the bathtub. This evidence strongly supported defendant's identity as the perpetrator.

Also in the bathroom, police discovered a pair of blue jeans covered in what appeared to be the victim's blood and flesh. The flesh and a majority of the blood were not tested for DNA, but one spot on the back of the jeans was tested and matched the victim's DNA. The inside waistband of the jeans was also swabbed and submitted for DNA testing. According to the DNA expert, such swabs were meant to identify the person who wore the jeans. There were three contributors for the waistband—79% of the DNA belonged to the victim, 16% belonged to defendant, and 5% was from an unknown individual. The DNA expert testified the victim's DNA from the test came from all of the victim's blood on the jeans, and defendant's DNA likely arrived on the jeans because he wore them. In light of this, finding defendant's jeans covered in the victim's blood and flesh was strong evidence he committed the crime.

When the police moved the victim's body, they found shredded photographs of the victim's family, including defendant's children. Police also found a photograph, which was intact, of defendant's daughter, placed on a chair in the living room. These pictures allowed for an inference defendant was the perpetrator for two reasons. First, testimony established the photographs were in boxes when Kenneth left for work. This meant the person who removed the photographs and shredded them had to know where to find them. Considering defendant lived in the home, he was one of the few people who would know where to find those photographs. Second, Kenneth testified defendant was the only person Kenneth knew who had a good relationship with defendant's daughter (shown in the untorn photograph on the chair), but bad or nonexistent relationships with the others. This evidence also allowed for an inference defendant was the person who killed and beheaded the victim.

Additionally, when defendant was arrested, police noticed he had injuries on his hands. Kenneth testified he did not notice those injuries when he saw defendant before Kenneth left for work on the day of the murder. Kenneth believed he would have noticed the injuries if they existed when the two were in a car together earlier that day. The police officer who photographed defendant's injuries testified they appeared fresh. Dr. Lokman Sung, who performed the autopsy, opined that, in the process of killing and beheading the victim, the perpetrator easily could have injured himself. Although defendant testified he obtained the injuries while working on his car,

the jury was free to find defendant's testimony not credible and believe the prosecutor's witnesses who testified the injuries likely were caused while he killed and decapitated the victim. This decision by the jury was further supported by testimony from Kenneth and Tiffanie Howell, defendant's best friend, about defendant's lack of history of working on automobiles. Considering defendant had injuries on his hands consistent with beating the victim to death and then beheading her, this evidence supported defendant's identity as the victim's murderer.

In support of his argument there was insufficient evidence to identify him as the perpetrator, defendant relies on factual disputes related to the testimony of a few witnesses. First, defendant notes his fingerprints were not found on any of the knives, the pieces of the broken piggy bank, or the blood-covered door knobs. This may be true, but defendant misconstrues how such lack of evidence affects the Court's analysis. Just as there was no fingerprint evidence that defendant handled those items, there was no evidence defendant was excluded as the person who handled them either. Thus, even though his prints did not remain on the items, the jury could still infer he used them on the basis of all of the other evidence just discussed. As this Court has explained, all conflicts that arise in the evidence, such as this, must be resolved "in favor of the prosecution." See *Mikulen*, 324 Mich App at 20.

Next, defendant notes the bloody palm print on the bathtub could have been caused by defendant placing his clean hand in some blood that already was on the bathtub. Defendant notes he testified this likely occurred when he went to the bathroom to vomit and wash out his mouth after Kenneth discovered the body. Once again, defendant has identified a factual dispute in the evidence, which the jury was permitted to—and apparently did—resolve in favor of the prosecution. Testimony established the bloody palm print could have been caused either by a bloody hand being placed on the tub or a clean hand being placed in blood, and while defendant would prefer us to believe his testimony, we must resolve this factual dispute in favor of the prosecution. *Id.* Thus, this argument by defendant lacks merit.

Lastly, defendant challenges the inculpatory value of the blue jeans found in the bathroom. He notes the lack of DNA testing of the suspected blood and flesh on the front of the jeans meant those substances could have actually been dirt and grime. Once again, defendant has successfully identified a potential factual dispute in the evidence. The jury *could have* believed the blue jeans were not covered in the victim's blood and flesh, but presumably chose to believe the opposite. This conclusion was well-supported by the evidence, which included proof that a drop of blood on the rear of the jeans belonged to the victim. Thus, the mere possibility the front of the jeans were covered in dirt and grime instead of the victim's blood and flesh was, at best, a factual dispute, which we must settle in favor of the prosecution. *Id.* Defendant also contends the DNA from the waistband of the jeans was not dispositive of his guilt. He notes the DNA could have arrived on the jeans in the washing machine. While that might be a possibility, the DNA expert testified the DNA on the waistband of the jeans likely came from the victim's blood and from defendant wearing them. The jury was free to believe this testimony, *Hardiman*, 466 Mich at 428, and any dispute in the evidence must be resolved in favor of the prosecution. *Mikulen*, 324 Mich App at 20.

In sum, there was significant circumstantial and physical evidence proving defendant was the person who killed and decapitated the victim. In arguing the contrary, defendant has merely identified instances when the evidence could have been viewed by the jury in a manner more

favorable to him. But the jury was permitted to consider the evidence and decide who and what to believe; it did so and decided to convict defendant of first-degree premeditated murder. Accordingly, we reject defendant's contention there was insufficient evidence to identify him as the perpetrator of the crime.

## 2. PREMEDITATION

Defendant alternatively argues that, even assuming he did kill the victim, there was insufficient evidence of premeditation, warranting reversal of his conviction of first-degree murder. Although "premeditation and deliberation are separate elements, a rigid and mechanical application is often difficult because the same facts may tend to establish each element, and they are subjective factors usually incapable of direct proof absent an admission or confession by the defendant." *Oros*, 502 Mich at 240-241. Considering the difficulty of proving a defendant's state of mind, "when considering a sufficiency-of-the-evidence issue, '[t]he question is whether the evidence introduced at the trial fairly supports an inference of premeditation and deliberation.' " *Id*. at 242, quoting *People v Morrin*, 31 Mich App 301, 331; 187 NW2d 434 (1971) (alteration in original).

In *Oros*, 502 Mich at 242-244, relevant to the issue of premeditation and deliberation, the Michigan Supreme Court stated:

> Premeditation and deliberation may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a "second look." *People v Gonzalez*, 468 Mich 636, 641; 664 NW2d 159 (2003); *People v Tilley*, 405 Mich 38, 45; 273 NW2d 471 (1979). That is, "some time span between the initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation," but it is within the province of the fact-finder to determine whether there was sufficient time for a reasonable person to subject his or her action to a second look. See *Gonzalez*, 468 Mich at 641 (quotation marks, brackets, and citation omitted). "While the minimum time necessary to exercise this process is incapable of exact determination," *Tilley*, 405 Mich at 45 (quotation marks and citation omitted), "[i]t is often said that premeditation and deliberation require only a 'brief moment of thought' or a 'matter of seconds,' " 2 LaFave, Substantive Criminal Law (3d ed), § 14.7(a) p 650 (citations omitted). "By the weight of authority the deliberation essential to establish murder in the first degree need not have existed for any particular length of time before the killing." 4 Blackstone, Commentaries on the Laws of England, p 195 n 14. "The time within which a wicked purpose is formed is immaterial, provided it is formed without disturbing excitement. The question of deliberation, when all the circumstances appear, is one of plain common sense; and an intelligent jury can seldom be at a loss to determine it." *People v Holmes*, 111 Mich 364, 372; 69 NW 501 (1896) (quotation marks and citation omitted).
>
> "The requisite state of mind may be inferred from defendant's conduct judged in light of the circumstances." [*People v*] *Hoffmeister*, 394 Mich [155,] 159[; 229 NW2d 305 (1975)]. In other words, what constitutes sufficient evidence

to support the elements of premeditation and deliberation may vary from case to case because the factual circumstances will vary, but the ultimate answer may be resolved in determining whether reasonable inferences may be made to support the fact-finder's verdict. For example, in *People v Johnson*, 460 Mich 720, 733; 597 NW2d 73 (1999), this Court held that evidence of a struggle between the defendant and the victim can be evidence of premeditation and deliberation based on the defendant's opportunity to take a "second look." And this Court has also held that "[m]anual strangulation can be used as evidence that a defendant had an opportunity to take a 'second look.' " *Gonzalez*, 468 Mich at 641. But in *Hoffmeister*, this Court found that insufficient evidence existed to show premeditation and deliberation because, when the only evidence presented was the number of stab wounds, there was no basis for the jury to conclude that the defendant had adequate time for a "second look." *Hoffmeister*, 394 Mich at 159.

In the present case, defendant contends the prosecutor did not present any evidence he had a chance to take a "second look" before killing the victim. We disagree. The prosecutor presented evidence that defendant committed the murder with his fists, the baby gate, and a ceramic piggy bank. Testimony established the piggy bank came off of a shelf of knickknacks on the wall between the living and dining rooms. The baby gate, on the other hand, was wedged into the doorway separating those two rooms. Dr. Sung testified some of the wounds the victim suffered were caused by objects, such as the baby gate, but others likely were caused by a fist or the piggy bank. From this evidence, the jury could infer there was a point when defendant attacked the victim with one of the weapons and, at some point during the attack, he switched weapons. Defendant either had to exchange the piggy bank for the baby gate, or vice versa. In the time it took to do so, defendant had "sufficient time . . . to subject his or her action to a second look." See *Oros*, 502 Mich at 242.

Considering the difficulty in proving defendant's state of mind, the jury was permitted to rely on inferences from minimal evidence related to the circumstances of the murder. *Id*. at 243-244. Indeed, in *Oros*, the Supreme Court was clear that "[t]he requisite state of mind may be inferred from defendant's conduct judged in light of the circumstances." *Id*. at 243. Here, defendant's conduct of retrieving a second weapon while in the process of beating the victim established he had sufficient time to reconsider his actions. The jury presumably decided defendant did so when he paused his assault on the victim, obtained a new weapon, and finished beating her to death. This was sufficient evidence to prove premeditation.

This was not the only evidence of premeditation. Notably, police found shredded photographs underneath the victim's body. From this evidence, a reasonable juror could infer defendant cut up the photographs before killing the victim because the pieces were found underneath her body, not on top or next to it. Given that the cutting of the photographs likely occurred during a dispute between the victim and defendant, there was a space of time when defendant had the ability to consider and take a second look at his decision to kill the victim. In convicting defendant of first-degree premeditated murder, the jury decided defendant thought about killing the victim and decided to do so, which proved premeditation. *Id*. at 242-244.

The evidence introduced at trial was sufficient to prove defendant's identity as the killer and that the killing of the victim was premeditated.  Consequently, there was sufficient evidence to sustain defendant's conviction of first-degree premeditated murder.  *Id*.

Affirmed.

/s/ Kristina Robinson Garrett
/s/ Kirsten Frank Kelly
/s/ Noah P. Hood